**NORWALK CORE et al., Plaintiffs-Appellants,**

v.

**NORWALK REDEVELOPMENT AGENCY et al., Defendants-Appellees.**

**No. 227, Docket 31761.**

United States Court of Appeals Second Circuit.

Argued Jan. 10, 1968.

Decided June 7, 1968.

Jonathan W. Lubell, New York City (Lubell and Lubell, New York City, Stephen L. Fine, Westport, Conn. and Dennis J. Roberts, Newark, N. J., on the brief), for appellants.

Vincent D. Flaherty, Norwalk, Conn., for appellee Norwalk Redevelopment Agency.

Thomas A. Flaherty, So. Norwalk, Conn., for appellee City of Norwalk.

Terrence J. Murphy, Jr., Norwalk, Conn., for appellee Norwalk Housing Agency.

Robert A. Slavitt, Norwalk, Conn., for appellees Towne House Gardens, Inc. and David Katz & Sons, Inc.

Michael C. Farrar, Attorney, Dept. of Justice, Washington, D. C. (Edwin L. Weisl, Jr., Asst. Atty. Gen., Alan S. Rosenthal, Attorney, Dept. of Justice, and Jon O. Newman, U. S. Atty., Hartford, Conn., on the brief), for appellees Robert C. Weaver and Charles J. Horan.

Donald Holtman, Simsbury, Conn., for Connecticut Civil Liberties Union, amicus curiae.

Robert L. Carter and Lewis M. Steel, New York City, for National Ass'n for the Advancement of Colored People, amicus curiae.

Joseph B. Robison, Sol Rabkin and Bertram S. Halberstadt, New York City, for National Committee Against Discrimination in Housing, amicus curiae.

Before SMITH, KAUFMAN and HAYS, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This appeal raises timely and fundamental questions regarding the availability of the federal courts to persons who, displaced by urban renewal programs, claim that they have been deprived of the equal protection of the laws in connection with government efforts to assure their relocation, and that such relocation efforts have not been adequate under the mandate of a federal statute. The plaintiffs' complaint, which attempted to raise these two issues, was dismissed by the District Court for the District of Connecticut. Norwalk CORE v. Norwalk Redevelopment Agency, 42 F.R.D. 617

(1967). We hold that the District Court was in error, and remand for further proceedings not inconsistent with this opinion.

The program involved here is being carried out in the City of Norwalk, Connecticut, and is designated South Norwalk Renewal Project No. 1 (Project No. Conn. R–34). (Hereinafter "the project.") The project plan was approved by the Common Council of Norwalk (the city's legislative body) on August 28, 1962, and on June 24, 1963 the Norwalk Redevelopment Agency ("the Agency") entered into a Loan and Capital Grant Contract ("the Contract") with the Housing and Home Finance Agency (now the Department of Housing and Urban Development, "HUD") under the Housing Acts of 1949 and 1954 ("the Act"). 63 Stat. 413 (1949), as amended, 42 U.S.C. §§ 1441–1460 (Supp.1967); and 68 Stat. 590 (1954), as amended, 42 U.S.C. §§ 1446–1460 (Supp.1967).[1]

Pursuant to section 105(c) of the Act, 42 U.S.C. § 1455(c), the Contract required that the Agency provide, in the urban renewal area or in other areas not generally less desirable in regard to public utilities and public and commercial facilities, decent, safe and sanitary dwellings within the financial means of the families displaced by the project, equal in number to the number of displaced families, available to them, and reasonably accessible to their places of employment.

The plaintiffs are the Norwalk, Connecticut chapter of the Congress of Racial Equality, two nonprofit tenants' associations comprised of low-income Negroes and Puerto Ricans, and eight individuals representing four classes of low-income Negroes and Puerto Ricans who were allegedly subjected to discrimination in connection with the project.[2] They brought this class action in June 1967 against the Norwalk Housing Authority, its Executive Director and its members; the Norwalk Redevelopment Agency, its Administrator and its members; the City of Norwalk, its mayor and city clerk; Towne House Gardens, Inc.; David Katz & Sons, Inc.; Charles J. Horan, Assistant Regional Administrator for Renewal Assistance of the United States Department of Housing and Urban Development; and Robert C. Weaver, Secretary of the United States Department of Housing and Urban Development.[3]

---

1. The functions of the Housing and Home Finance Agency were transferred to the Secretary of Housing and Urban Development by section 5 of the Department of Housing and Urban Development Act, 79 Stat. 669 (1965), as amended, 42 U.S.C. § 3534 (Supp.1967). See also 81 Stat. 17 (1967). We will use the initials HUD throughout this opinion to refer to both the Department of Housing and Urban Development and its predecessor, the Housing and Home Finance Agency.

2. The four classes are: (1) those still occupying homes within the project area; (2) those whose homes in the project area have been demolished, and who now occupy "overcrowded" rental units outside of the project area but within the City of Norwalk; (3) those whose homes in the project area have been demolished, and who now occupy rental units "at excessive rentals" outside of the project area but within the City of Norwalk; and (4) those who formerly lived in Norwalk, but "by virtue of the acts of defendants" complained of, now occupy rental units outside of the City. It is alleged that each class is too numerous to make it practicable to bring all of its members before the Court, that each will be fairly and adequately represented by those plaintiffs who are members of it, that there are common questions of law and fact affecting the rights of all members of each class, and that as to each a common relief is sought.

The Spring Street Tenants Association is composed of low-income Negroes who formerly lived in the project area, and who, it is alleged, have not been relocated into decent and proper housing at rentals within their financial means and reasonably accessible to their places of employment. The Day Street-Washington Village Tenants Association is composed of low-income Negroes and Puerto Ricans living outside the project area, allegedly in "unsafe and indecent housing beyond their financial means."

3. Where it is necessary to distinguish among the defendants, we will call Horan

**924**

Since the action was dismissed, the allegations of the complaint, summarized in the following paragraphs, must be accepted as true.

The Agency made its redevelopment plans without providing for the construction of low-rent housing on the ground that the existing low-rent public housing in the City, with its predicted turnover, would adequately meet the relocation needs of the low-income Negro and Puerto Rican families living within the project area. Prior to the time when it entered into the Contract, however, the Agency knew: (1) that its turnover figures were exaggerated, arrived at so as to present apparent facilities for relocation; (2) that there was a long waiting list for low-rent public housing in the City, substantially all Negro and Puerto Rican families and that any plan giving priority to families from the project area in the public housing would impair the housing opportunities of the Negroes and Puerto Ricans on the waiting list; and (3) that there was discrimination against Negroes and Puerto Ricans in the private housing market in the City. Thereafter, the Agency learned from reports by the Commission on Civil Rights of the State of Connecticut and by the Agency's "relocation experts," Urban Dynamics Consultants, that vacancies in housing projects in the City were running less than one-half of the predicted number, that the Housing Authority received an average of over 300 applications per year for public housing units, and that discrimination in rentals in the private or open market was rampant, rentals to Negro and Puerto Rican families averaging twice as much as that charged to white families for compar-

able housing. The annual report of the City's Department of Health for the year 1964 stated that families formerly living in the project area were being crowded into already overcrowded homes, and that multiple dwelling units were being created from homes which were barely adequate for one family. The Agency knew, plaintiffs allege, that Negro and Puerto Rican families were being subjected to such hardships and deprivations in connection with relocation (not experienced to any substantially equal degree by white families in the City) that many were being forced to leave the City entirely, but it continued, nonetheless, to demolish the homes of low-income Negro and Puerto Rican families in the project area and continued to make additions and revisions in its plans without making any provision for the construction of low-rent housing to be made available to the Negro and Puerto Rican families being relocated. The Agency also entered into a contract with defendant Towne House in May 1967 for the sale of a six-acre parcel of land in the project area to be used for 90 units of moderate-income housing at rentals beyond the financial means of the Negro and Puerto Rican families being displaced, and that parcel is the only plot of land owned by the City which is currently available for the construction of low-income housing.

Despite the requests of various groups and citizens of the City, including some of the plaintiffs, HUD has refused to require the construction of low-cost housing, and has approved the sale of the six-acre parcel. "Further recourse to HUD would be futile." [4]

and Weaver the "federal defendants," Towne House Gardens, Inc. and David Katz & Sons, Inc. the "private defendants," and the remaining defendants the "local defendants." Towne House is described in the complaint as a Connecticut corporation to which the City and the Agency have agreed to sell six acres of land in the project area; David Katz & Sons, Inc. is described as a Connecticut corporation, the sponsor of the

project, the owner and/or operator of the largest number of apartments and apartment structures in the City, and the owner of one-half of the stock of Towne House.

4. Nothing we say in this opinion precludes defendants from trying to show to the District Court's satisfaction that plaintiffs have failed to take advantage of available administrative remedies.

The complaint goes on to allege that the homes of various of the plaintiffs and other Negro and Puerto Rican families and individuals have been demolished, that some of them have been moved to rental units within the project area on a temporary basis, and that the City and Agency have "pursued a course of conduct to force the said Negro and Puerto Rican families out of the on-site housing structures by rendering such housing unsafe, unsanitary and indecent, by charging rents beyond the financial means of the families and individuals, by forcing excessive moving of families and individuals from one on-site location to another * * * and by carrying on heavy construction activities around the said on-site houses." Some of the displaced Negro and Puerto Rican families have been compelled to move into overcrowded housing, some into housing at rentals substantially in excess of their financial means, and some into housing outside of the City.

The plaintiffs make three claims based upon the foregoing allegations: (1) that they and those whom they represent have been denied the equal protection of the laws guaranteed by the Fourteenth Amendment and by the laws of the United States; (2) that the local defendants have intended to deprive low-income Negro and Puerto Rican families of the equal protection of the laws, and have intended to force such families out of the City; and (3) that the defendants have acted in violation of section 105(c) of the Act.

Plaintiffs' prayer for relief included requests that the Agency and City, and Towne House and Katz, be enjoined from transferring or encumbering the six-acre parcel, that the Agency be enjoined from demolishing any residential structure within the project area until the residents have been relocated into safe and decent housing at rentals they can afford, and that the District Court require the Agency, City and Authority to proceed "with all deliberate speed," under the supervision of the Court, to propose a plan for and to construct low-income housing units on the six-acre parcel.

The essential ground upon which the District Court dismissed the complaint was that both the association and individual plaintiffs "have no standing to challenge the official conduct here in question." 42 F.R.D. at 622. The District Court also held that the action was not a proper class action under Rule 23, F.R.Civ.P.

The court took into account that the relief asked for in the complaint was in its view inappropriate, but we are not sure of the extent to which this underlay its decision. The opinion concluded that "It is the use of [the] six acre tract for moderate-income housing rather than low-income rental units that forms the basis of the instant action." 42 F.R.D. at 619. This characterization of the action in terms of the prayer for relief was, in a sense, correct, for the complaint summarized the action as one for an injunction restraining the defendants from proceeding with the sale of the six-acre parcel and directing them to build low-rent housing on the parcel, and for an injunction restraining the defendants from evicting families living in the project area until all of the families were permanently relocated in housing within their financial means. Nevertheless, if the complaint was dismissed on the basis that the relief requested was inappropriate, or beyond the Court's power to grant, the Court moved too quickly. Rule 54(c), F.R. C.P., states in relevant part that

> Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings.

When a motion to dismiss a complaint is made, this rule is read in conjunction with Rules 8, 12 and 15, and its clear and long-accepted meaning is that a complaint should not be dismissed for legal insufficiency except where there is a

failure to state a claim on which *some* relief, not limited by the request in the complaint, can be granted.[5]

We hold that the allegations of this complaint state constitutional and statutory claims on which relief can be granted, that the individual plaintiffs have standing to make the claims, and that this action was appropriately, brought as a class action. We turn first to the issues presented by plaintiffs' constitutional claim.

## I.

The plaintiffs contend that they were denied the equal protection of the laws when the defendants acted, knowingly and deliberately, so as to compound the problem of racial discrimination in the Norwalk housing market, with the inevitable and intended result that some Negroes and Puerto Ricans would be forced to leave the city altogether.[6]

The District Court never reached the merits of this claim, for it concluded that

> Members of the public, whether living inside or outside a project area, ordinarily have no standing to challenge planning of an urban renewal project * * * nor, by alleging

civil rights violations, do they gain standing they would otherwise not have [citing cases]. If residents of a project area cannot challenge a project while it is in the planning stages and before construction has begun, certainly they can have no standing to assert the same kind of challenge at a time when planning has been implemented, most of the land has been purchased and conveyed to developers, and construction of new buildings has been almost completed.

42 F.R.D. at 622.[7] It is true that courts have been reluctant to interfere with urban renewal planning. The fact that the reasons for this reluctance have been lumped together under the rubric of "lack of standing to sue" should not be allowed to obscure the distinction, necessary albeit not altogether clear, between the propriety of allowing particular plaintiffs to bring litigation (their standing to sue) and the propriety of judicial attempts to resolve the problem which the plaintiffs are attempting to bring before the court (the question of justiciability).[8]

■ We consider first the issue of standing. The courts will not, it is clear, entertain a suit by one who does not

5. 6 Moore's Federal Practice ¶ 54.60 (2d ed. 1966) and cases there cited; 2A Moore's Federal Practice ¶ 12.08; see also A. T. Brod & Co. v. Perlow, 375 F.2d 393, 398 (2 Cir. 1967).

6. The complaint asserts that the jurisdiction of the District Court is based upon 28 U.S.C. § 1343(3) and (4); and 42 U.S.C. §§ 1981, 1982, 1983 and 1988. Additionally, it is alleged that the matter in controversy exceeds the sum of $10,000, and that there is jurisdiction under 28 U.S.C. § 1331. The complaint was not dismissed for want of jurisdiction, and none of the defendants has contended before us that jurisdiction is wanting. It is clear that the District Court has subject matter jurisdiction.

7. The District Court did not distinguish the *issue of plaintiffs' standing to raise* their equal protection claim from that of plaintiffs' standing to seek judicial review of action which the federal defendants have taken under section 105(c) of

the Act. Given the allegations of the complaint, its holding necessarily covered *both issues*. Insofar as the *question of* standing relates to the personal stake which plaintiffs have in the outcome of the litigation, the issues are the same. But the question whether the constitutional right which plaintiffs are claiming is one which the courts will protect must be considered separately from the question whether the courts will ever review the administrative action which is challenged. Where such review is not available, the situation is usually characterized as "lack of standing." The question of standing to seek judicial review of the *administrative action is the* subject of part II of this opinion.

8. On the unclear distinction between standing and justiciability, see note 13 *infra*. Our *discussion of "standing"* in this part of the opinion is limited to the standing of the individual plaintiffs. We consider the standing of the association plaintiffs separately in part III.

have some personal stake in the outcome of the litigation.) See Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Stark v. Wickard, 321 U.S. 288, 304, 64 S.Ct. 559, 88 L.Ed. 733 (1944); cf. Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 151, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (opinion of Mr. Justice Frankfurter). In Frothingham v. Mellon, 262 U.S. 447, 486–89, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), the Supreme Court refused to allow a federal taxpayer to challenge the constitutionality of a federal statute where the plaintiff's claimed interest in the outcome was simply that "the effect of the appropriations complained of will be to increase the burden of future taxation and thereby take her property without due process of law." 262 U.S. at 486, 43 S.Ct. at 600. The burden of future taxation was held to be essentially a matter of public, not individual, concern.

■ Even where a plaintiff has a personal stake in the outcome of a case, he may be denied standing to sue on the ground that the right which he is attempting to assert is not one which the courts will recognize. Thus, one cannot as a general matter object to governmental action on the basis that it aids one's competitors, for it is said that no legal wrong results from lawful competition. Alabama Power Co. v. Ickes, 302 U.S. 464, 468–469, 58 S.Ct. 300, 82 L.Ed. 374 (1938); Kansas City Power & Light Company v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924, cert. denied 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955).[9] This court has, accordingly, refused to grant standing to plaintiffs who object to urban renewal planning on this basis. Taft Hotel Corp. v. Housing and Home Finance Agency, 262 F.2d 307 (2 Cir. 1958), cert. denied 359 U.S. 967, 79 S.Ct. 880, 3 L.Ed.2d

835 (1959); Berry v. Housing and Home Finance Agency, 340 F.2d 939 (2 Cir. 1965).

Harrison-Halsted Community Group, Inc. v. Housing and Home Finance Agency, 310 F.2d 99 (7 Cir. 1962), cert. denied 373 U.S. 914, 83 S.Ct. 1297, 10 L.Ed.2d 414 (1963), relied on by the District Court, is similar to *Taft* and *Berry*. Plaintiffs there sought to bar the acquisition and clearing, under an urban renewal program, of an area in Chicago for the use of the University of Illinois. They alleged that they would suffer economic injury if the plan were carried out, and that some of them had relied on past promises and representations of government officials in connection with previously announced plans for residential and commercial development in the area. The court held that it did not appear that any of the plaintiffs' "private legal rights" had been violated.[10]

■■ The plaintiffs in the case before us are in a very different position. Their stake in the outcome of the case is immediate and personal, and the right which they allege has been violated— the right not to be subjected to racial discrimination in government programs —is one which the courts will protect. Their standing to sue is clear. Cf. Nashville I–40 Steering Committee v. Ellington, 387 F.2d 179 (6 Cir. 1967), cert. denied 390 U.S. 921, 88 S.Ct. 857, 19 L.Ed.2d 982 (1968).

The District Court opinion also raised, at least by implication, the question of justiciability. Holding that the plaintiffs could not "gain standing they would otherwise not have" by alleging "civil rights violations," the Court cited Green Street Association v. Daley, 373 F.2d 1 (7 Cir.), cert. denied 387 U.S. 932, 87 S.Ct. 2054, 18 L.Ed.2d 995

---

9. One may, of course, have standing based on competitive interests where it is provided by statute. See F. C. C. v. Sanders Brothers Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940), and see part II of this opinion, infra.

10. The main question in *Harrison-Halsted* was whether the plaintiffs had a right to judicial review of administrative action taken under the Housing Act of 1949. See part II, infra.

(1967).[11] The complaint in *Green Street* alleged, *inter alia,* that the urban renewal project which the plaintiffs were attempting to bring before the court was not undertaken in good faith, but was a "deliberate plan to create a no-Negro 'buffer zone' between [a] shopping area and [a] surrounding residential community so that the shopping area [would] be more attractive to white customers * * *," and that the plan proposed "relocation of the residents in the cleared area in accordance with segregated housing patterns * * *." 373 F.2d at 4.

The Seventh Circuit characterized the first count of the complaint, which attempted to raise constitutional issues as to the reasons for which the plan was undertaken, as "an attempt to obtain federal judicial review of a program of urban renewal prior to the exercise of the power of eminent domain." 373 F.2d at 6. It held that cases presenting such challenges are matters for condemnation proceedings in the state courts if the taking is ostensibly for a public purpose, and that only in exceptional cases such as Progress Dev. Corp. v. Mitchell, 286 F.2d 222 (7 Cir. 1961),[12] "where the facts alleged indicate to all outward appearances that the taking is designed solely to deny constitutional rights, is the power of eminent domain subject to the prior scrutiny of the federal courts." 373 F.2d at 7.

The fourth count of the complaint in *Green Street* dealt with the alleged deficiencies in the relocation program. Claims were made under section 105 of the Housing Act of 1949, 42 U.S.C. § 1455(c), section 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and the equal protection clause of the Fourteenth Amendment. The court discussed the issue of standing to sue under the two statutes, but not standing to raise the equal protection claim.

The Seventh Circuit thus did not say that the *Green Street* plaintiffs lacked standing to raise their constitutional claims. Much of what the court said about the first count of the complaint, however, implies that it harbored some doubt as to the justiciability of the issues which the plaintiffs were attempting to raise in that count. It was a concern for "the practical and efficient administration of urban renewal programs," 373 F.2d at 5, and a reluctance to inquire into the subjective reasons of the legislative authority seeking to acquire the land in question, id. at 6, which underlay the court's refusal to review the urban renewal program prior to the exercise of the power of eminent domain.[13] The holding reached was narrow, however: that the issues should

11. The Court also cited Johnson v. Redevelopment Agency of the City of Oakland, California, 317 F.2d 872 (9 Cir.), cert. denied 375 U.S. 915, 84 S.Ct. 216, 11 L.Ed.2d 154 (1963), on this issue. While violation of the Fifth and Fourteenth Amendments was alleged in that case, upon appeal the issues had narrowed to whether or not the defendant had formulated and was carrying out a feasible plan of relocation as required by section 105(c) of the Act.

12. In *Progress*, the plaintiffs were subdivision developers, who had announced their intention to sell some of the houses they proposed to construct to Negroes. The complaint alleged, *inter alia*, that the defendants were abusing their power to condemn land and to enforce local building ordinances so as to discriminate against plaintiffs because of their announced intention to sell to Negroes.

The Seventh Circuit, characterizing the case as one concerning "the corporate right to engage in business and make a profit," 286 F.2d at 234, held that the District Court had "erred in granting summary judgment [for defendants] on the complaint." Ibid.

13. Similar concerns underlay the decision in *Harrison-Halstead*, supra. "Lack of standing" and "want of justiciability" (or, in different words, the presence of a "political question") are doctrines serving the same general purpose of assuring that the courts pass only on questions which are raised in actual cases or controversies and which are ripe and appropriate for judicial determination. They are, therefore, doctrines between which no clear distinction is generally found. See Bickel, The Least Dangerous Branch, 125–126 (1962) and Note, 77 Yale L.J. 966, 976–987 (1968).

be raised, if at all, in state court condemnation proceedings.

It was contended at oral argument in this case that plaintiffs' constitutional claim is non-justiciable; in particular, that cases such as this one cannot be heard without involving the courts in over-all urban renewal planning, and thus in the resolution of questions which are ultimately political. We need not concern ourselves with the problem raised by the first count of the complaint in *Green Street:* the justiciability of a challengè to the basic validity of an urban renewal program, on the ground that the program as a whole, is intended to achieve or perpetuate racial segregation.[14] Plaintiffs here complain that they were denied the equal protection of the laws in the planning and implementation of the relocation program, and this, at least, is a justiciable claim. (The Seventh Circuit agrees, for it reached the merits of the constitutional issues raised by the *fourth* count of the complaint in *Green Street.*)

We cannot doubt the necessity of discretionary decision making in urban renewal planning. This necessity would render unfit for judicial decision many questions concerning urban renewal. See Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); cf. Berman v. Parker, 348 U.S. 26, 33, 75 S.Ct. 98, 99 L.Ed. 27 (1954). This does not mean, however, that every case or controversy touching this area lies beyond judicial cognizance. Case-by-case inquiry is necessary, with due regard for the need for judicially discoverable and manageable standards for resolving problems to be undertaken, and with recognition of the role played by the coordinate branches of the Federal Government in the planning and implementation of urban renewal. See Baker v. Carr, supra, 369 U.S. at 208–217, 82 S.Ct. at 691.

The extent to which relocation of those displaced by urban renewal is required will necessarily affect the pace at which urban renewal can take place, and the priority of goals in urban renewal planning. Issues are at stake which are, in the truest sense of the word, political. For example, if public housing were required to be available for every displacee of urban renewal, then it would follow, at least in the present condition of the nation's cities, that the building of public housing would be assigned very high priority. The standard for relocation is thus appropriately set by the legislative and executive branches of government, and not by the courts. Congress has provided, in section 105(c) of the Act, that the standard for relocation is "decent, safe and sanitary dwellings" in the urban renewal area or in other areas not generally less desirable, within the financial means of the families displaced. The executive branch (HUD) is entrusted with the primary responsibility for enforcing this standard.

The basic constitutional claim raised by the allegations of the complaint, as we understand it, is that in Norwalk this standard was less sufficiently met in the relocation of Negroes and Puerto Ricans than in the relocation of whites. We need not consider the political question of the adequacy of the standard to conclude, as we have for reasons set out below, that proof of these allegations would make out a case of violation of the equal protection clause, and we see no reason to believe that the courts are incapable of fashioning remedies to insure that the standard is equally met for all citizens. With this case only at the pleadings stage, we do not think that we should speculate on what specific remedies might be appropriate if the plaintiffs' allegations are proved. As a general matter, the most appropriate form of judicial relief in cases such as this would be to require proof that the relocation standard is being met in

---

14. We note that an overall challenge of this type was considered on the merits in Nashville I–40 Steering Committee v. Ellington, 387 F.2d 179 (6 Cir. 1967), cert. denied 390 U.S. 921, 87 S.Ct. 2054, 18 L.Ed.2d 995 (1968).

general as adequately for non-whites as it is for whites before allowing the project to go forward. An affirmative form of relief, such as an order requiring the construction of low-income housing, would of course be much less appropriate, since it would necessarily involve the court in areas foreign to its experience and competence.

If the defendants' argument is that requiring that the relocation standard be met equally for all displacees, non-white as well as white, will result in delays in the implementation of some urban renewal programs, the answer is that such delays would be due to the standard, rather than its equal implementation for all. Whether or not such delays must be prevented is much more in the nature of a political question than is the constitutional issue which plaintiffs are attempting to raise.

Nothing we have said so far would require considering plaintiffs' constitutional claims, of course, if the complaint did not allege a deprivation of equal protection of the laws, in violation of the Fourteenth Amendment.[15] As we read the District Court's opinion, it was held below, on the authority of *Green Street,* supra, that no such deprivation was alleged.[16]

One of the allegations in *Green Street,* as we have noted above, was that the relocation provisions of the urban renewal plan expressly acknowledged the existence of a segregated residential pattern in the City of Chicago, and it was contended that implementation of these provisions was in violation of the plaintiffs'

rights to equal protection of the laws. With respect to this, the Court said:

> The existing "segregated" residential pattern is accidental to the Plan. The city admittedly could not require relocation in any particular area; it may only determine what housing is available in fact and offer whatever assistance it can in furnishing this information to displacees. The local defendants may not be enjoined from proceeding with the Plan simply because the Plan fails to include what the local defendants would be powerless to enforce—"integrated" relocation.

373 F.2d at 9. Similarly, the District Court in the case before us said that the defendants' relocation program "is designed to prevent displacees from suffering any consequences or change in circumstances, if and when they are relocated into the discriminatory housing market. They cannot owe a greater duty to end a situation which is merely 'accidental' to the plan." 42 F.R.D. at 623.

We do not understand plaintiffs' constitutional argument to be that defendants must end discrimination in the Norwalk open housing market through the relocation plan, or even that defendants must find integrated housing for those displaced by the Project. Those are arguments we need not consider until they are appropriately put to us.

What plaintiffs' complaint alleges, in substance, is that in planning and implementing the Project, the local defendants did not assure, or even attempt to assure, relocation for Negro and Puer-

---

15. U.S.Const. amend. XIV; § 1: " * * * No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

16. The opinion below could be read as holding only that plaintiffs had no stand-ing to challenge administrative action under the Housing Act of 1949, and that the Civil Rights Act of 1964 conferred no standing privileges on plaintiffs. See 42 F.R.D. at 622–623. But the complaint clearly raised an equal protection claim against the local and private defendants, the jurisdiction of the court was properly alleged (see note 6, supra), and we must read the opinion as having passed on the equal protection claims.

to Rican displacees in compliance with the Contract to the same extent as they did for whites; indeed, they intended through the combination of the Project and the rampant discrimination in rentals in the Norwalk housing market to drive many Negroes and Puerto Ricans out of the City of Norwalk. The argument is that proof of these allegations would make out a case of violation of the equal protection clause. We agree.

█ Section 105(c) of the Act provides that contracts for loans or capital grants entered into under the Act shall require the availability or the provision of relocation housing for displacees which meets the standard set out in that section. That standard is designed, as the District Court recognized, to prevent displacees from suffering a change for the worse in their living conditions. It is no secret that in the present state of our society discrimination in the housing market means that a change for the worse is generally more likely for members of minority races than for other displacees.[17] This means that in many cases the relocation standard will be easier to meet for white than for non-white displacees.[18] But the fact that the discrimination is not inherent in the administration of the program, but is, in the words of the District Court, "accidental to the plan," surely does not excuse the planners from making sure

that there is available relocation housing for all displacees. "Equal protection of the laws" means more than merely the absence of governmental action designed to discriminate; as Judge J. Skelly Wright has said, "we now firmly recognize that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme." Hobson v. Hansen, 269 F.Supp. 401, 497 (D.D.C.1967).[19]

Since the plaintiffs are admittedly displaced as a result of the Project, there is no question of the presence of "state action" within the meaning of the Fourteenth Amendment. Where the relocation standard set by Congress is met for those who have access to any housing in the community which they can afford but not for those who, by reason of their race, are denied free access to housing they can afford and must pay more for what they can get, the state action affirms the discrimination in the housing market. This is not "equal protection of the laws."[20]

What we have said may require classification by race. That is something which the Constitution usually forbids, not because it is inevitably an impermissible classification, but because it is one which usually, to our national shame, has been drawn for the purpose of main-

---

17. See, e. g., U. S. Advisory Commission on Intergovernmental Relations, Relocation: Unequal Treatment of People and Businesses Displaced by Governments (1965); and Hartman, The Housing of Relocated Families, 30 J.Am.Inst.Planners 266, 273–274 (1964).

18. We wish to stress that the specific problem is not that non-white displacees are, on the average, poorer than white displacees. That may be so, but it is a more general problem. What we are concerned with is that discrimination which forecloses much of the housing market to some racial groups, thereby driving up the price they must pay for housing. The situation is made worse by the fact that most people displaced

by urban renewal are non-white. See Note, 77 Yale L.J. 966, 967 (1968).

19. See generally Black, Foreword: "State Action," Equal Protection, and California's Proposition 14, 81 Harv.L.Rev. 69 (1967).

20. We need not consider whether the state has so involved itself in acts of private discrimination in the housing market as to make those otherwise private acts "state action." See Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); cf. Jones v. Alfred H. Mayer Company, 379 F.2d 33 (8 Cir.), cert. granted 389 U.S. 968, 88 S.Ct. 479, 19 L.Ed.2d 459 (1967) (No. 645).

taining racial inequality.[21] Where it is drawn for the purpose of achieving equality it will be allowed,[22] and to the extent it is necessary to avoid unequal treatment by race, it will be required.[23]

■ We hold that plaintiffs' complaint alleges a denial of the equal protection of the laws, and that the District Court should have proceeded to consider that claim on its merits.

## II.

The plaintiffs' statutory claim is that the federal and local defendants have violated section 105(c) of the Act, 42 U.S.C. § 1455(c) (Supp. 1967).[24] The District Court concluded that plaintiffs lacked standing to raise this issue. Since the section requires provision for

the relocation of displaced families, it can hardly be thought that displaced families such as plaintiffs, do not have the required personal stake in the outcome of litigation where a violation of the section is claimed. If anybody can raise this claim, it is these plaintiffs. The question we must answer is whether actions taken by HUD and local public agencies under section 105(c) are ever subject to judicial review.

■ The proposition is now firmly established that "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967).[25] We have concluded that

21. See, e. g., Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92, L.Ed. 1161 (1947); Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958).

22. Offerman v. Nitkowski, 378 F.2d 22 (2 Cir. 1967); Springfield School Committee v. Barksdale, 348 F.2d 261, 266 (1 Cir. 1965).

23. United States v. Jefferson County Board of Education, 380 F.2d 385, 386 (5 Cir., en banc, 1967), affirming 372 F.2d 836 (5 Cir. 1966), cert. denied Bd. of Education of the City of Bessemer v. United States, 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104.

24. Section 105 provides, in relevant part: "Contracts for loans or capital grants shall be made only with a duly authorized local public agency and shall require that—

* * * * *

(c) (1) There shall be a feasible method for the temporary relocation of individuals and families displaced from the urban renewal area, and there are or are being provided, in the urban renewal area or in other areas not generally less desirable in regard to public utilties and public and commercial facilities and at rents or prices within the financial means of the individuals and families displaced from the urban renewal area, decent, safe, and sani-

tary dwellings equal in number to the number of and available to such displaced individuals and families and reasonably accessible to their places of employment. * * * "

The section's coverage was extended to displaced individuals by the Housing and Urban Development Act of 1965, and that extension does not apply to this project. See section 305(c) of that Act, 79 Stat. 476 (1965). So far as now appears, the plaintiffs all represent displaced families.

25. See also Cappadora v. Celebrezze, 356 F.2d 1, 6 (2 Cir. 1966); 4 Davis, Administrative Law Treatise § 28.21 (1965 Supp.); Jaffe, Judicial Control of Administrative Action, 372–374 (1965).

As the Supreme Court said in Abbott Laboratories v. Gardner, the Administrative Procedure Act, 5 U.S.C. §§ 701–706, under which plaintiffs here seek judicial review, reinforced the early cases in which judicial review of administrative action was entertained. See 387 U.S. at 140, 87 S.Ct. 1507.

5 U.S.C. § 701 provides that "This chapter applies * * * except to the extent that (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." There is no need for us to consider whether these exceptions apply only where Congress' intent in the matter is explicit, for we discern no Congressional intent, implied or explicit, to preclude

plaintiffs are aggrieved, and that there is no persuasive reason to believe that Congress intended to cut off judicial review.

The defendants maintain that plaintiffs cannot obtain judicial review of action under section 105(c) unless they can show that Congress, in enacting that section, intended to confer upon them a "legal right" to protection. A "legal right" to protection means, in the abstract, nothing at all. The specific and practical question here is whether or not plaintiffs may seek enforcement of the section, and the cases make it clear that the answer turns on whether Congress' purpose in enacting it was to protect their interests. Hardin v. Kentucky Utilities Company, 390 U.S. 1, 5–7, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968); Chicago Junction Case, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667 (1924).[26] That was precisely Congress' purpose, as the legislative history of the Act clearly indicates:

> The bill sets up adequate safeguards against any undue hardship resulting from the undertaking of slum clearance under current conditions. It requires, first, that no slum-clearance project shall be undertaken by a local public agency unless there is a feasible means for the temporary relocation of the families to be displaced, and unless adequate permanent housing is available or is being made available to them.[27]

Congress was deeply concerned that slum conditions be eliminated, not merely displaced to grow up elsewhere. The Senate Report stated, in words which have when read today a somewhat prophetic ring:

> Approximately one out of every five of our urban families is living today under slum conditions which, in turn, are the breeding ground for disease, juvenile delinquency, and crime. Your committee is convinced that the Nation cannot and should not tolerate indefinitely the social costs resulting from the impact of these conditions.[28]

The relocation requirements of section 105(c) were not enough, of course, to ensure the elimination of slum conditions, and Congress recognized this fact.[29] But they were designed to work toward that end by guaranteeing that, in clearing slum areas, government would not be driving into still worse

---

review or to commit determinations under section 105(c) to HUD's absolute discretion. See Davis, "Judicial Control of Administrative Action": A Review, 66 Colum.L.Rev. 635, 651–52 (1966). The Supreme Court, by framing the test as "persuasive reason to believe that such was the purpose of Congress," appears to say that the intent may be implied. 387 U.S. at 140, 87 S.Ct. at 151.

26. The Administrative Procedure Act, 5 U.S.C. § 702, provides that "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." We do not think that this language is to be construed as limiting judicial review to those situations where Congress has explicitly referred to persons "adversely affected" or "aggrieved" by agency action. That would

not be a "hospitable" interpretation of the Act's "generous" review provisions. Abbott Laboratories v. Gardner, 387 U.S. at 140–141, 87 S.Ct. at 1507. We will, in accordance with what the Supreme Court has said in Hardin v. Kentucky Utilities Company, supra, consider any person attempting to assert an interest, personal to him, which the "relevant statute" was specifically designed to protect, and which he claims is not being protected, as "adversely affected or aggrieved" within the meaning of that statute.

27. S.Rep. No. 84, 81st Cong., 1st Sess., in U.S.Code Cong.Serv. (1949) pp. 1550, 1564.

28. Id. at p. 1560.

29. See id. at 1561; and see generally Note, Judicial Review of Displacee Relocation in Urban Renewal, 77 Yale L.J. 966 (1968).

conditions the people who lived in those areas. As the Senate Committee put it, the bill set up adequate safeguards against any undue hardship.

It has been suggested to us that since section 105(c) only provides that the relocation requirements be included in loan or capital grant contracts, the requirements are merely contract rights possessed by the federal government, which cannot be enforced by displacees. This is a proposition we cannot accept, for much more is involved here than a narrow issue of contract rights. As we have already said, the fact that Congress intended to protect the specific interests of displacees when it enacted the section is enough to give the displacees standing, in the absence of a persuasive reason to believe that Congress intended to cut off judicial review. Judicial review obtains not only to advance what have traditionally been viewed as "legal rights," but also to vindicate the public interest,[30] and Congress has made clear its view that adequate relocation is in the public interest. That Congress provided for enforcement of the relocation provisions through contracts with the local agencies does not weaken the appropriateness of judicial review, for such a method of enforcement is natural where Congress is specifying what requirements local agencies must meet in order to receive federal aid. The possibility that an administrative agency, charged with enforcing a requirement established by Congress in the public interest, will not adequately perform the task is equally great whether enforcement is through contract or through direct regulation. Accordingly, the reasons for allowing those who have a direct, personal interest in furthering the Congressional purpose to seek judicial review of administrative action are as compelling in one situation as in the other.

We have found no reason to believe that Congress intended to cut off judicial review under the Act. Nothing in the Act or its legislative history indicates such an intent,[31] and we do not think that it can be inferred from the nature of the subject with which the Act deals. The defendants have argued that urban renewal does not readily lend itself to judicial review, and, in the words of the Supreme Court in Perkins v. Lukens Steel Co., 310 U.S. 113, 131–132, 60 S.Ct. 869, 1879, 84 L.Ed. 1108 (1940), that "The interference of the Courts with the performance of the ordinary duties of the executive departments of the Government, would be productive of nothing but mischief * *." We have already indicated in part I of this opinion our general views on the appropriate scope of judicial review in this area. We are not subjecting to judicial scrutiny the planning of urban renewal programs, see Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), nor are we considering the adequacy of the relocation standard set by Congress.[32] The judicial review which we make available to the displacees in this case is entirely different from the sweeping judicial action sought by the respondents in *Perkins*, who could point to no statute enacted for

---

**30.** See Scenic Hudson Preservation Conference v. F. P. C., 354 F.2d 608, 615–617 (2 Cir. 1965), cert. denied Consolidated Edison Co. of New York, Inc. v. Scenic Hudson Preservation Conference, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966); Office of Communication of United Church of Christ v. F. C. C., 359 F.2d 994, 1000–1006 (D.C.Cir. 1966). See generally Reich, The Law of the Planned Society, 75 Yale L.J. 1227 (1966).

**31.** It has been pointed out that where Congress intends that administrative determinations under the Act may be unreviewable, it has said so explicitly: under section 114 of the Act, added in 1964, 78 Stat. 788–90, as amended 42 U.S.C. § 1465(e) (Supp. 1967), determinations with regard to relocation assistance payments may be made unreviewable. Note, 77 Yale L.J. 966, 972 n. 28 (1968).

**32.** See text following note 14, supra.

their protection and giving them standing. See especially 310 U.S. at 126–127, 60 S.Ct. at 869.

Since this case has not advanced past the pleadings stage, and there is nothing before us to indicate what efforts HUD has made to require relocation in compliance with the standard of section 105 (c), or what the plaintiffs claim HUD should have done, it would be a mistake for us to attempt at this time to state specifically what we would expect of HUD in this respect.[33]

The defendants have relied heavily in their briefs and oral argument upon Johnson v. Redevelopment Agency of the City of Oakland, California, 317 F.2d 872 (9 Cir.), cert. denied 375 U.S. 915, 84 S.Ct. 216, 11 L.Ed.2d 154 (1963), and Green Street Association v. Daley, 373 F.2d 1 (7 Cir.), cert. denied 387 U.S. 932, 87 S.Ct. 2054, 18 L.Ed.2d 995 (1967). We decline to follow those cases to the extent they are inconsistent with what we have said here.

The Seventh Circuit held in *Green Street*[34] that the plaintiffs there had no standing to claim that relocation provisions were inadequate under section 105(c), relying entirely on its decision in Harrison-Halsted Community Group, Inc. v. Housing and Home Finance Agency, 310 F.2d 99 (7 Cir. 1962), cert. denied 373 U.S. 914, 83 S.Ct. 1297, 10 L.Ed.2d 414 (1963). The plaintiffs in *Harrison-Halsted* objected to certain land use decisions in an urban renewal project. They claimed that they had standing to seek judicial review of actions of the Housing and Home Finance Agency (predecessor of HUD) because they would suffer economic injury as a result of those actions. The court's conclusion that the interest asserted was not sufficient to support standing was based on a long line of cases holding that injury through economic competition is generally not a sufficient basis for standing to sue.[35] But none of those cases supports a holding that displacees have no standing to seek judicial review of agency action under section 105(c). It has always been held that a competitive interest of the kind asserted in those cases is sufficient to support standing where the statute, under which the action sought to be reviewed has been taken, is one intended to protect that interest.[36] The interest which displacees have in being relocated in decent,

---

33. The provisions of the Administrative Procedure Act on scope of judicial review are set out in 5 U.S.C. § 706. We note that the plaintiffs are requesting review of a substantive determination, rather than of the procedures followed by HUD in making the determination sought to be reviewed.

34. We have discussed other aspects of the *Green Street* decision in part I of this opinion.

35. Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938); Berry v. Housing and Home Finance Agency, 340 F.2d 939 (2 Cir. 1965); Taft Hotel Corp. v. Housing and Home Finance Agency, 262 F.2d 307 (2 Cir. 1958), cert. denied 359 U.S. 967, 79 S.Ct. 880, 3 L.Ed.2d 835 (1959); Pennsylvania Railroad Company v. Dillon, 335 F.2d 292 (D.C.Cir.), cert. denied American-Hawaiian S. S. Co. v. Dillon, 379 U.S. 945, 85 S.Ct. 437, 13 L.Ed.2d 543 (1964);

Allied-City Wide v. Cole, 97 U.S.App. D.C. 277, 230 F.2d 827 (1956); Kansas City Power & Light Company v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924, cert. denied 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955); Pittsburgh Hotels Association, Inc. v. Urban Redevelopment Authority of Pittsburgh, 309 F.2d 186 (3 Cir. 1962), cert. denied Hilton Hotels Corp. v. Urban Redevelopment Authority of Pittsburgh, 372 U.S. 916, 83 S.Ct. 730, 9 L.Ed.2d 723 (1963). Defendants have relied upon some of these cases in their briefs, pointing to language suggesting that the availability of judicial review turns upon the presence of Congressional intent to bestow a "legal right" to protection, or, in other cases, upon the invasion of a "legally protected right." The results reached in these cases are entirely consistent with the result reached here.

36. Hardin v. Kentucky Utilities Company, supra; *Chicago Junction Case*, supra.

safe and sanitary housing is no less important than any other interest, "competitive" or otherwise, which has been given statutory protection. Since Congress specifically intended to protect the displacees' interest in adequate relocation, the displacees have standing.

It has been suggested that Johnson v. Redevelopment Agency of the City of Oakland, California, supra, need not be read to preclude altogether judicial review of agency action under 105(c).[37] We think that a fair reading of the opinion in that case indicates that the Ninth Circuit viewed Congress' decision to incorporate relocation requirements in contracts with the local agencies as precluding judicial review. See 317 F.2d at 874. We have already given our reasons for rejecting that view.[38]

The approach we have taken is consistent with our decision in Gart v. Cole, 263 F.2d 244 (2 Cir.), cert. denied 359 U.S. 978, 79 S.Ct. 898, 3 L.Ed.2d 929 (1959). The appellants in that case claimed standing to assert violations of the Housing Act's alleged requirement of open bidding on all property sold as part of the project involved. We concluded that the sections allegedly establishing the requirements were "designed to protect not the interests of landowners or tenants in a redevelopment area, but those of the public at large," and we held, on the basis of familiar authority already discussed in this opinion, that the appellants could not challenge an expenditure of funds "as representatives of so broad an interest." 263 F.2d at 250. We went on to hold that the plaintiffs did have standing to challenge a refusal to grant them an oral hearing on the feasibility of the project's relocation plan, and to claim that the Administrator had improperly delegated his duty to review the feasibility of the project's relocation provisions. Our inquiry there, as here, was explicitly whether the relevant statutory provisions were designed to protect the interests which the plaintiffs were asserting.[39] See 263 F.2d at 251. The defendants have argued that Gart v. Cole should be distinguished as involving procedural claims, rather than substantive ones. Although the scope of judicial review of substantive questions may differ from the scope of review where procedural questions are at issue, this does not make Gart v. Cole irrelevant. The question before us is standing, not the ultimate scope of review.

We hold, then, that judicial review of agency action under section 105(c) of the Act is available to displacees.[40]

37. Note, 73 Yale L.J. 1080 (1964).

38. The opinion in Johnson makes reference to Hunter v. City of New York, 121 N.Y.S.2d 841 (Sup.Ct.1953). We read that case as holding that state courts have no jurisdiction to review the actions of agencies of the federal government.

39. Cf. Merge v. Sharott, 341 F.2d 989 (3 Cir. 1965).

40. The plaintiffs contend that section 601 of the Civil Rights Act of 1964, 42 U.S. C. § 2000d, is an independent basis on which they have standing to sue. That contention presents a question which we do not think we should decide at this stage of this case. We do not read the section to set forth requirements differing from what is required of the states by the Fourteenth Amendment, and thus the plaintiffs need not rely on the section to assert their claims of discrimination against the local defendants or to obtain relief against them. Since we do not know what the plaintiffs would have the District Court require of the federal defendants, we do not know whether section 601 is relevant so far as the federal defendants are concerned. The framework of sections 601–605 of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d–2000d–4, indicates that those sections are intended to assign to federal agencies an independent responsibility to bar discrimination in federally assisted programs.

We note that in Bossier Parish School Board v. Lemon, 370 F.2d 847 (5 Cir.), cert. denied 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967), where it was held that the plaintiffs had standing to sue under section 601, the defendants

This does not mean, of course, that the courts are to intervene in relocation activities at the behest of every displacee disappointed in his relocation. Familiar doctrines limit the occasions on which particular judicial remedies, if any, are appropriate. In determining whether there has been compliance with section 105(c) of the Act, courts will evaluate agency efforts and success at relocation with a realistic awareness of the problems facing urban renewal programs. Objections by individual displacees based on too literal an interpretation of the Act's standards could unnecessarily interfere with programs of benefit to the entire community.

### III.

▮▮ The District Court held that this suit could not properly be brought as a class action under Rule 23 of the Federal Rules because there were no questions of law or fact common to the class or classes which the plaintiffs claim to represent. We think that the District Court erred in reading the complaint as requesting ultimately that the Court concern itself with the particular circumstances of each displacee's relocation.[41] The complaint alleges both that Negroes and Puerto Ricans were discriminated against in connection with relocation and that the relocation standards of section 105(c) were generally not met for Negro and Puerto Rican displacees. These allegations clearly raise questions of fact common to the class which plaintiffs represent. The fact that some members of the class were personally satisfied with the defendants' relocation efforts is irrelevant. Cf. Potts v. Flax, 313 F.2d 284, 288–289 (5 Cir. 1963).[42]

The association plaintiffs were denied standing below because they are "not themselves members of the classes whose rights they claim to be asserting." 42 F.R.D. at 622. We think that the reasons for requiring an individual plaintiff in a class action to be a member of the class do not necessarily preclude an association from representing a class where its *raison d'etre* is to represent the interests of that class. We do not decide, however, whether the association plaintiffs have standing. The answer to that question depends on whether there is a compelling need to grant them standing in order that the constitutional rights of persons not immediately before the court might be vindicated. See NAACP v. State of Alabama, ex rel. Patterson, 357 U.S. 449, 458–460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).[43] It appears to us

---

contended that the Fourteenth Amendment was inapplicable because the school children being segregated were "federal children." But cf. Gautreaux v. Chicago Housing Authority, 265 F.Supp. 582 (N. D.Ill., 1967).

41. The local defendants assert in their brief that it was held in Cypress v. Newport News General and Nonsectarian Hospital Association, 375 F.2d 648, 653 (4 Cir. 1967), that unless abuse is shown the trial court's decision as to whether or not a proper class action has been brought is final. The Fourth Circuit said nothing of the kind in that case. The Court was addressing itself specifically to the question whether the number of members of the class was sufficiently large to meet the requirement of Rule 23(a) (1) that the class be so numerous that joinder of all members is impracticable. That is a question of fact which the court naturally held to be within the

competence of the District Court to determine. It is alleged in this case that the class is sufficiently numerous, and the District Court did not find otherwise.

42. We further hold that the requirements of Rule 23(b) have been met. The District Court concluded that Rule 23(b) (2) was not satisfied because the specific relief requested by the plaintiffs was not, in its view, appropriate. We have already given our reasons for holding that the court is not limited to granting the relief requested, and it appears to us that final injunctive or declaratory relief with respect to the class as a whole would be appropriate if the allegations of the complaint are proved.

43. We reject the local defendants' contention that an association cannot represent the rights of its members unless the interests of the association itself are

that the individual plaintiffs can adequately represent the interests of all members of the relevant class, but we will not preclude the plaintiffs from trying to show to the District Court's satisfaction that it is only the association plaintiffs which can perform this function.

Judgment reversed. Remanded for further proceedings not inconsistent with this opinion.

HAYS, Circuit Judge (dissenting):

I would affirm the determination of the district court.

The issues which the plaintiffs offer are not justiciable and the remedies they seek are not within the power of the court to grant. See Perkins v. Lukens Steel Co., 310 U.S. 113, 131–132, 60 S.Ct. 869, 879, 84 L.Ed. 1108 (1940) ("The interference of the courts with the performance of the ordinary duties of the executive departments of the Government, would be productive of nothing but mischief," quoting Decatur v. Paulding, 39 U.S. (14 Pet.) 497, 516, 10 L.Ed. 559 (1840)); Berman v. Parker, 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954) ("We do not sit to determine whether a particular housing project is or is not desirable").

The holding that plaintiffs do not have standing to bring the action is another formulation of the same principles. See Green Street Association v. Daley, 373 F.2d 1 (7th Cir.), cert. denied, 387 U.S. 932, 87 S.Ct. 2054, 18 L.Ed.2d 995 (1967); Berry v. Housing and Home Finance Agency, 340 F.2d 939 (2d Cir. 1965) (per curiam); Johnson v. Redevelopment Agency, 317 F.2d 872 (9th Cir.), cert. denied, 375 U.S. 915, 84 S.Ct. 216, 11 L.Ed.2d 154 (1963); Pittsburgh Hotels Association v. Urban Redevelopment Authority, 309 F.2d 186 (3d Cir. 1962), cert. denied sub. nom. Hilton Hotels Corp. v. Urban Redevelopment Authority, 372 U.S. 916, 83 S.Ct. 730, 9

L.Ed.2d 723 (1963); Taft Hotel Corp. v. Housing and Home Finance Agency, 262 F.2d 307 (2d Cir. 1958) (per curiam), cert. denied, 359 U.S. 967, 79 S.Ct. 880, 3 L.Ed.2d 835 (1959); Allied-City Wide, Inc. v. Cole, 97 U.S.App.D.C. 277, 230 F.2d 827 (1956) (per curiam).

The Federal courts cannot administer the housing program.

involved. In NAACP v. State of Alabama, ex rel. Patterson, the Supreme Court specifically referred to the likelihood that the association itself would be adversely affected as a "further factor" pointing towards the holding of standing. 357 U.S. at 459–60, 78 S.Ct. at 1163.