Aldena ENGLISH et al., and Huntington Township Committee on Human Relations, Plaintiffs-Appellants,

v.

TOWN OF HUNTINGTON et al., Defendants-Appellees.

No. 1082, Docket 71–1552.

United States Court of Appeals, Second Circuit.

Argued July 16, 1971.

Decided Aug. 26, 1971.

Oakes, Circuit Judge, dissented and filed opinion.

Jonathan Shapiro, New York City (Jack Greenberg, New York City, Morris J. Baller, Marina Del Rey, Cal., and Sam R. Raskin, Huntington, N. Y., of counsel), for appellants.

Frank J. Mack, First Deputy Town Atty., Northport, N. Y. (Nicholas La Carrubba, Town Atty., Town of Huntington, and Harold Mortensen, Asst. Town Atty., Huntington, N. Y., of counsel), for appellees.

Before FRIENDLY, Chief Judge, and LUMBARD and OAKES, Circuit Judges.

FRIENDLY, Chief Judge:

The plaintiffs in this action, brought in the District Court for the Eastern District of New York on February 7, 1969, are nine black or Puerto Rican residents of the Town of Huntington, L. I., and the Huntington Township Committee on Human Relations (HTCHR). The individual plaintiffs alleged, among other things, that they had been evicted or were being threatened with eviction from their homes in consequence of an urban renewal project near Huntington Station for which the United States, acting through the Department of Housing and Urban Development (HUD), had made a grant pursuant to 42 U.S.C. § 1452a, and that the Town had not complied with a condition of the contract, imposed pursuant to 42 U.S.C. § 1455(c), requiring relocation of families displaced from the urban renewal area, see Urban Renewal Handbook, RHA 7207.1. They and HTCHR asserted that this was but one phase of a plan of the Town of Huntington to force blacks and Puerto Ricans out of the Town. They also alleged they were bringing the suit as a class action

on behalf of "all the black and Puerto Rican residents of the Town who are being and have been deprived of their rights to equal housing opportunities by the actions of the defendants." The defendants were the Town of Huntington and a number of its officials (hereinafter "the local defendants") and the Regional Administrator and the Secretary of HUD (hereinafter "the federal defendants"). They filed separate answers, denying most of the allegations of the complaint. At some later date they moved to dismiss.

On July 2, 1970, Judge Travia filed a memorandum opinion and order denying this motion. In the course of the opinion he said that "[s]ubject to a showing that the class which plaintiff displacees purport to represent is insufficiently large, * * * this action has been properly brought as a class action. * * * Whether the association plaintiff, HTCHR, may properly represent the interests of minority groups depends on a showing at trial that '* * * there is a compelling need to grant them standing in order that the constitutional rights of persons not immediately before the court might be vindicated,'" quoting from Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 937 (2 Cir. 1968).

The instant appeal stems from an application for a preliminary injunction against the local defendants made on November 20, 1970. The nub of the matter was that the Town was about to institute legal proceedings with respect to four dwellings that were being occupied in a manner violating various provisions of the Town's codes. The district court was asked to enjoin the local defendants from "commencing or prosecuting any legal proceeding to enforce any provision of the Town building, housing or zoning ordinances, civil or criminal, which would result, directly or indirectly, in the eviction of the plaintiffs or any members of their class from their homes, or from taking any other action which would result in such eviction unless and until decent, safe and sanitary

housing at rents within their means and in no less desirable locations is provided for them. * * * "

Both sides filed extensive affidavits and some testimony was taken. On May 13, 1971, Judge Travia denied the motion for a preliminary injunction, "with leave granted to plaintiffs to immediately renew said motion upon telephone notice to the attorneys for the defendants as to any person evicted or threatened with eviction as a result of the legal proceedings being taken by defendant Town of Huntington to enforce the provisions of the Code of the Town of Huntington applicable to zoning, building and housing who is a person displaced from the Town of Huntington urban renewal area in Huntington Station who has been relocated in the first instance in the premises from which he is being evicted or threatened with eviction." After the district court had denied a motion for an injunction pending appeal, a panel of this court enjoined the local defendants "from taking any action which will result in the eviction of the members of plaintiffs' class from the four houses against which legal action is contemplated * * * " pending an expedited appeal.

The district court's order denying the preliminary injunction displays a disregard of the requirement of F.R.Civ.P. 52(a), that "in granting or refusing interlocutory injunctions the court shall * * * set forth the findings of fact and conclusions of law which constitute the grounds of its action." However, findings are not a jurisdictional requirement of appeal, Rossiter v. Vogel, 148 F. 2d 292, 293 (2 Cir. 1945), and we can discern enough solid facts from the record to enable us to render a decision.

The four houses which are the subject of the contemplated legal action by the Town are in the Greenlawn section of Huntington, some five miles from the urban renewal area. Greenlawn is zoned primarily for single family use. Each of the four houses, originally constructed for a single family, now contains three separate apartments. The dwellings are occupied by some forty persons, 18 in one

house alone, from a minimum of 17 different families. Although the record is not clear on this point, we shall assume in appellants' favor that all the occupants are blacks or Puerto Ricans. None of the individual plaintiffs reside in these houses, and none of the occupants are persons who were displaced by the urban renewal project.

One of plaintiffs' affidavits stated:

These apartments and rooms are illegal. They are also terribly overcrowded since they house far more people than can live in them consistent with minimum standards of health, privacy, and decency. In the typical case several living units share bathroom and kitchen facilities. Several individuals or even families commonly are squeezed into one room. Many people live in basements.

One of defendants' affidavits asserted, with abundant supporting detail, that conditions in the four houses represent "violations of the most flagrant type in which the public health, safety and welfare of the other citizens in the community * * * is [sic] in direct jeopardy." An affidavit of the Assistant Town Attorney stated that there are "totally inadequate fire escape routes, living space and accommodations," and that "[t]hese people live in the midst of filth, vermin, pestilence and disease." He detailed an instance of a basement apartment accessible only by a flight of wooden stairs, which would be the first thing to burn in the event of a fire on the ground floor. The four buildings are owned by four different landlords, deservedly characterized by the Town as "slumlords," none of whom lives in Huntington. Complaints about conditions in the buildings had been received from other residents of Greenlawn, both black and white.

■ The parties are in initial disagreement whether plaintiffs were entitled to present the grievances of persons who have not been proven to be displacees of the urban renewal project. Plaintiffs point to the portion of the complaint with respect to representation which we have quoted above. While this allegation was broad enough to encompass black and Puerto Rican occupants of the four houses, it is by no means clear from the excerpt quoted from the district judge's memorandum opinion that he determined that plaintiffs were entitled to represent so large a class as is now asserted, as distinguished from the displacees; his doubts whether the class was sufficiently large would indicate, if anything, that he found plaintiffs entitled to represent only the displacees. He was not required to find otherwise. While, to be sure, the Advisory Committee had civil rights actions in mind when it wrote F.R.Civ.P. 23(b) (2), that fact alone does not relieve a court of its obligation to determine that the representative parties will "clearly and adequately protect" the interests of the class, F.R.Civ.P. 23(a) (4), and that the claims and defenses of the representatives are typical of the claims or defenses of the class, F.R.Civ.P. 23(a) (3). Clearly the displacees had special claims differing from the black and Puerto Rican inhabitants of Huntington in general. *Norwalk CORE* does not assist the plaintiffs here since the individual plaintiffs in that case appeared to represent only the class of displacees, of which they formed a part, and the standing of the associations to represent the same class was left to the determination of the district court in accordance with the ability of the individual plaintiffs to perform adequately the representative function. While this alone might suffice for affirmance, we believe the court did not abuse its discretion in denying the preliminary injunction even if we should make the doubtful assumption that plaintiffs in this action were in a position to seek it.

*Norwalk CORE* does not carry the day for plaintiffs on the merits. The relevant holdings of that case, reversing a dismissal of the complaint on defendants' motion, were that an allegation that the standard for relocation of families displaced by urban renewal projects was

"less sufficiently met in the relocation of Negroes and Puerto Ricans than in the relocation of whites" raised a justiciable claim under the Equal Protection Clause of the 14th Amendment, 395 F.2d at 929–930, and that a claim that the local officials and HUD had failed to comply with the relocation requirements of 42 U.S.C. § 1455(c) was likewise justiciable. It was in light of these holdings that Judge Travia rightly refused to dismiss the instant complaint. But neither *Norwalk CORE*, Kennedy Park Homes Ass'n v. City of Lackawanna, 436 F.2d 108 (2 Cir. 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971), nor any of the 36 other cases cited by appellants involved the question of how far a municipality is prohibited from non-discriminatory enforcement of building or zoning codes because the persons affected are members of minority groups who unhappily are more likely than others to inhabit such dwellings and to have greater difficulty in obtaining new housing.

We can put aside at the outset the questions that would arise if any of the occupants of the four buildings were persons who had been displaced by the urban renewal project. All the evidence was that they were not and the terms of the judge's order indicate that he would very likely have granted relief of some sort if there had been such evidence.[1] Plaintiffs likewise failed to show that any of the occupants of the buildings had been displaced from former dwellings by persons relocated from the renewal project, and we therefore need not consider what the legal consequences would be if they had.

 It is elementary that the due process clause does not prevent a city from taking legal steps to require the correction or, failing that, the elimination of housing which constitute such sanitary or fire hazards as to endanger the health or lives of occupants or persons living in the vicinity, Keyes v. Madsen, 86 U.S. App.D.C. 24, 179 F.2d 40, 42 (1949), cert.

denied, 339 U.S. 928, 70 S.Ct. 628, 94 L.Ed. 1349 (1950); American Home Fire Assur. Co. of New York v. Mid West Enterprise Co., 189 F.2d 528, 530–531 (10 Cir. 1951); cf. Queensboro Hills Realty Co. v. Saxl, 328 U.S. 80, 66 S.Ct. 850, 90 L.Ed. 1096 (1946). A municipality may do this even though persons who are themselves in danger may prefer to accept the hazards rather than undergo what they regard as worse consequences, at least when there is danger to others as there was here, cf. Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905), and under some circumstances even when there is not. Compare Commonwealth v. Howie, 354 Mass. 769, 238 N.E.2d 373, cert. denied, 393 U.S. 999, 89 S.Ct. 485, 21 L.Ed.2d 464 (1968); State ex rel. Colvin v. Lombardi, 241 A.2d 625 (R.I. 1968). Contra, American Motorcycle Ass'n v. Davids, 11 Mich.App. 351, 158 N.W.2d 72 (1969). Of course, in exercising this power, a municipality must act consistently with the equal protection clause. If there were proof that the Town of Huntington was seeking to condemn four dwellings occupied wholly or predominantly by blacks or Puerto Ricans and was doing nothing with regard to dwellings in equal violation of its codes which were occupied wholly or predominantly by whites, the great decision of Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), would come directly into play. But this is not even alleged. The closest plaintiffs come to any charge of discriminatory enforcement is a general claim that the building and zoning codes have not been vigorously applied. However, this is entirely consistent with a desire on the part of the local defendants not to exacerbate the problems of blacks and Puerto Ricans until better housing becomes available, and to move only against buildings where fire and sanitary hazards had gone far beyond tolerable limits. If the Town had moved more vigorously and extensively plaintiffs would doubtless be complaining even

1. This might well have taken the form of a direction for relocation of such persons rather than an outright injunction.

more loudly. The judge could permissibly have concluded that the Town sought to move only against buildings whose condition had gone too far beyond the limit to be tolerated.

■ We do not think the mere fact that the occupants of these buildings are blacks and Puerto Ricans prevents the Town from taking action it would be constitutionally entitled to take if they were white. It is an unpleasant fact of life that housing like this will be occupied by poor people, and a still more unpleasant one that black and Puerto Rican citizens are over-represented in that group. Yet the Supreme Court has only recently held that the mere fact that a requirement, otherwise proper, may have a greater impact on the poor, does not render it invalid under the Equal Protection Clause, James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971).

■ Plaintiffs claim that, however this may be, their case goes further in that the Town, by a long-standing and deliberate policy, has forced an expanding black and Puerto Rican population into the very sort of housing from which it now seeks to oust the occupants of these four dwellings—with the real objective being to get them out of the Town altogether. It may well be that if the Town had engaged in such violations of the Constitution, a court could prohibit otherwise lawful acts until the condition had been rectified. See Swann v. Charlotte Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); United States v. Bethlehem Steel Corp., 446 F.2d 652 (2 Cir. 1971). But these serious allegations, which were made in the complaint that began this action, are vigorously denied. The defendants, including the federal defendants sought to be injected into the case, claim that the Town has fully complied with the relocation provisions of the HUD grant. We do not think the case made on this application for a temporary injunction on a

matter collateral to the issue framed by the complaint was such as to require the judge, in effect, to hear all the evidence of conditions alleged to have lasted over years that will doubtless consume many days of trial. Contested allegations, no matter how sincerely made, are not the equivalent of proof; what this case, already pending for two and a half years, badly needs is the resolution of factual issues that only a trial can afford. In the absence of proof of the violations of the Constitution and laws of the United States which plaintiffs have charged, and in light of the Town's assurance that the facilities of the Department of Social Services of the Town of Huntington and Suffolk County will be available to furnish relocation assistance to occupants of the four dwellings who will have to vacate pending reconstruction or as a result of the razing of the four dwellings, the judge was not required to prohibit the Town from what would otherwise be a lawful exercise of the police power confided to it by the State of New York.

Affirmed.

OAKES, Circuit Judge (dissenting):

This suit seeking injunctive and declaratory relief against allegedly discriminatory housing and zoning policies of a Long Island community has been pending since February 7, 1969. Plaintiffs' motion for preliminary relief enjoining code enforcement proceedings against certain homes in what they refer to as a "ghetto area" of the town, not filed until November 20, 1970, was denied by the court below from the bench on April 23, 1970, without findings, conclusions or opinion. The colloquy between court and counsel, and the court's order of May 13, 1971, however, indicate that the court thought injunctive relief improper when sought on behalf of persons displaced by code enforcement rather than urban renewal, since the Town's only obligation was to relocate those people displaced by urban renewal.[1]

---

1. ORDERED, that plaintiffs' motion for a preliminary injunction be, and the same hereby is, denied, with leave granted to plaintiffs' [sic] to immediately renew said

It is interesting to note that, until the demand of this court at oral argument was complied with by letter dated July 20, the addresses of the four "homes" against which code enforcement has been threatened were not revealed to the plaintiffs, the court below or this court, "to minimize," we are now told, "the possibility of advance warning to the slumlord owners thereby enabling them to avoid service of process." [2]

The plaintiffs' main case—and their application for preliminary injunctive relief rests on it—purports to be a class action brought on behalf of "all the black and Puerto Rican residents of the Town who are being and have been deprived of their rights to equal housing opportunities by the actions of defendants." [3] The complaint alleges that the Town has deprived plaintiffs and other black and Puerto Rican citizens as a class of Thirteenth and Fourteenth Amendment rights by failing to provide a sufficient number of low income housing units through the Town Housing Authority or through zoning laws, and by failing to permit construction of any other multiple dwellings or inexpensive single dwellings. The complaint also alleges that, through urban renewal and inadequate relocation housing, the Town has deprived the individual named plaintiffs of their Thirteenth and Fourteenth Amendment rights.

The trial court very properly refused to dismiss the original action. Southern Alameda Spanish Speaking Organization (SASSO) v. City of Union City, 424 F.2d 291 (9th Cir. 1970); Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 931 (2d Cir. 1968). See also Kennedy Park Homes Ass'n v. City of Lackawanna, 436 F.2d 108 (2d Cir. 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971). The sole question here is whether denial of preliminary relief to forty black and Puerto Rican individuals, comprising seventeen families, was proper. That question involves two subsidiary inquiries. The first is whether the displaced families who live outside of the urban renewal area have any standing, either as members of plaintiffs' class or as persons suffering from discriminatory housing practices. The second is whether any pendent relief ought to be given when any right thereto is obviously intertwined with resolution of the merits, or, in other words, is dependent upon proof of the underlying claim that by failure to provide adequate low income housing the defendant Town, aided by the individual and federal

---

motion upon telephone notice to the attorneys for the defendants as to any person evicted or threatened with eviction as a result of the legal proceedings being taken by defendant Town of Huntington to enforce the provisions of the Code of the Town of Huntington applicable to zoning, building and housing who is a person displaced from the Town of Huntington urban renewal area in Huntington Station who has been relocated in the first instance in the premises from which he is being evicted or threatened with eviction.

Order of Judge Travia dated May 13, 1971.

2. Letter of Town of Huntington to U.S. Court of Appeals, Second Circuit, July 20, 1971. In the course of one of several colloquies in the proceedings below, the deputy town attorney, referring to the plaintiffs' attorney and the Town's refusal to "prejudice" its position by naming the four houses against which it intended to seek enforcement, said: "If the court will pardon my saying so, Mr. Shapiro doesn't know who his clients are, and I really wouldn't like to tell him." One might wonder why the court below permitted games to be played when important rights were involved. Plaintiffs have lost this appeal, but presumably the persons in the four houses could now bring suit on their own behalf; with the trial court in effect holding plaintiffs here have no standing to seek preliminary relief, and the appellate court reaching the merits without a remand, the binding effect of the judgment here on the forty people threatened with eviction is left to speculation.

3. Other relief sought in the complaint, only incidentally material here, includes relief against housing search warrants and threatened criminal proceedings and affimative relief to require construction of adequate relocation housing.

agency defendants, is discriminating against blacks and Puerto Ricans and in effect forcing them out of the Town.

In answering those questions on an expedited appeal we are handicapped no end by the absence of findings below. If in fact the trial court found that the forty persons for whom preliminary relief was sought were not within the plaintiffs' class, I think the trial court was in error. The allegations of the complaint were broad enough to encompass these persons. While, as a recent recruit from the district court, I sympathize with the trial judge's problems with Rule 23, Fed.R.Civ.P., this case seems to turn on—or at least involves—the same issue for both urban renewal displacees and other black and Puerto Rican residents of the town of Huntington: has the Town pursued, inadvertently or otherwise, and is it pursuing, a housing policy based on racial discrimination? Thus it would seem that the court below should properly have found, within Rule 23(b) (3) "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Cases of racial discrimination are particularly cited by the Advisory Committee on Rules as appropriate for class actions within Rule 23(b) (2) where "the party opposing the class has acted or refused to act on grounds generally applicable to the class. * * *" [Advisory Committee's Notes following Rule 23, Fed.R.Civ.P., 28 U.S. C.A. (1971).] At the very least it would seem to me we should remand for specific findings on this question.

I come then to the merits of the request for preliminary relief, assuming as the majority assumes, that plaintiffs had standing to seek it on behalf of the forty people living in substandard, not to say deplorable, housing in the town of Huntington. Suffice it to say that in my view, plaintiffs made a sufficient preliminary showing of the Town's long-standing policy of passivity resulting in housing discrimination against minority groups, to have justified a grant of some form of preliminary relief to maintain the *status quo*:

6. *Reduction in the Supply of Low-Cost Housing*: In the 10 year period 1960 to date there has been a net gain of over 16,000 dwelling units in the Town of Huntington. Of these only 40 have been low-cost rental units (public housing) while the bal- [*sic*] consisted of 189 two-family units and 16,424 single family homes. Average price of the single family homes exceeds $30,-000.

7. During the same period approximately 200, predominantly low-cost dwelling units, or over 14 times the number replaced, were demolished by public action in the Town of Huntington. The largest single factor in these demolitions was the Huntington Station Urban Renewal Project which displaced over 240 predominantly Black and Puerto Rican households. The balance of the demolitions was accounted for by code enforcement, highway construction, fires, etc., and also resulted in the substantial displacement of low-income minority-group households.

\* \* \* \* \* \*

12. Clearest evidence of this is glaringly apparent in the fact that the incidence of widespread overcrowding in illegal apartments is limited predominantly to low-income minority group neighborhoods such as Greenlawn. The Town, in its most recent Workable Program submittal, acknowledges that, "Vacancy rates for all levels of housing in the community (the Township of Huntington) are miniscule." The Housing Authority estimates an immediate need for 700 additional low-cost family units.

13. *The Town Continues to Exacerbate the Problem:* Instead of taking urgent steps to meet the growing need for low-cost minority-group housing in the Town, the Town has refused to respond and has, in fact, continued to

create the pressures bringing about a reduction in the supply. In spite of recommendations in 1964, by the Town's planning consultants, Harland Bartholomew, and Associates, the Town deleted from its Comprehensive Plan, the modest proposal to permit the construction of 3,000 additional apartments by 1980; and continued in effect its moratorium on apartments which was instituted in 1960. The Town has refused to approve recommendations by its Housing Authority in 1967 for the construction of 60 units of "Turnkey" public housing; and has periodically conducted code enforcement programs in minority-group neighborhoods to eliminate illegal apartments.

Affidavit of Yale Rabin, AIP, Nov. 24, 1970, Appellants' Appendix 102–05a (footnotes omitted).

On argument of the appeal the Town conceded that it had done nothing to find temporary replacement housing for the forty persons who, with code enforcement, will be evicted from the four "homes" against which enforcement is contemplated. Thus, taking the plaintiffs' allegations and supporting affidavits as true for our purposes, the Town has at least been a jewel of consistency.

The preliminary relief the court below might afford is not confined to prohibiting enforcement of the Town building code. "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." Swann v. Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (April 20, 1971). The district court might require the Town, *pendente lite,* to find suitable temporary housing for the people who would be displaced by the code enforcement. "The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims" Hecht Co. v. Bowles, 321 U.S. 321, 329–330, 64. S.Ct. 587, 592, 88 L.Ed. 754 (1944). The fact that it is a town which is claimed to be discriminating is of no moment.[4]

We have been reminded by the Supreme Court recently that however "administratively awkward, inconvenient and even bizarre" the remedy for "deliberately constructed and maintained" racial discrimination may be, "all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made * * *," Swann v. Board of Education, *supra,* 91 S.Ct. at 1282. That conclusion, I believe, holds as true for housing as for schools and for preliminary relief as for temporary or permanent relief. See *Kennedy Park Homes, supra; Norwalk CORE, supra.*

James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (U.S. April 26, 1971), may, I suppose, be read as the majority apparently reads it, to permit discrimination against the poor, despite past holdings in McDonald v. Board of Education, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969); Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), and other cases.[5] But no one has suggested

---

4. In a period of rapid change like ours, the pace of social adjustments must be quickened. Poignant experience has made us realize the public implications of interests heretofore treated as private. Such inests must be stripped of many of their past immunities and subjected to appropriate responsibility. Courts will thus be called upon to make and to sustain extensive readjustments.

Felix Frankfurter, Social Issues Before the Supreme Court (Yale Review, Spring 1933), reprinted in Kurland, Felix Frankfurter on the Supreme Court 290 (1970).

5. I would prefer to read *James* more narrowly as approving a state-wide referendum requirement for investment in low rent public housing in a state where other referenda are used on a variety of subjects, but I have to confess that the majority opinion in *James* does not seem to answer the point made in the dissent, so

that *James* erodes the vitality of Supreme Court decisions against racial discrimination. Indeed, *James* reaffirms, while distinguishing away, Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969) (referendum on housing ordinances creating classification based upon race invalid). Here, it seems to me, the plaintiffs allege, and have for purposes of preliminary relief sufficiently shown, *racial* discrimination.

I agree wholeheartedly with the majority opinion that "what this case, already pending for two and a half years, badly needs is the resolution of factual issues that only a trial judge can afford."[6] But surely until that trial is had the *status quo* of the parties should be maintained at least to the extent that the forty persons who seek preliminary relief should not be evicted from the town of Huntington. While much is made of the necessity and desirability of prompt code enforcement against the four dwellings here in question, the truth is that the Town has been dragging its heels as much as anyone. The trial court required the plaintiffs to submit a list of fifty-eight names of urban renewal displacees to the Town, with the understanding that the Town was to reveal within two days whether any of the fifty-eight were tenants of the four dwellings against which enforcement was sought. The plaintiffs complied with the court's order on November 30, or December 1, 1970, and in *April 1971* after a letter from the trial court, the Town produced an affidavit dated December 11, 1970, stating that there was no identity between any persons on the plaintiffs' list and those in the four dwellings. In fairness to the Town, however, it should be pointed out that a change in personnel apparently caused some confusion in the town attorney's office. (Tr. of April 23, 1971, hearing.)

Surely the court below can exercise that nice balance of "mercy and practicality" to which Hecht Co. v. Bowles, *supra,* refers, to bring about temporary adjustment here and to avoid the irreparable harm that eviction may cause these forty members of the plaintiffs' class. I would reverse and remand, to give the trial court the opportunity to do so.

---

that one might question whether the equal protection clause any longer applies to prevent discrimination against the poor *as such*.

6. It is likewise true that the question of policy-discrimination on which preliminary relief turns is the principal question on the merits.