**Alison SAXE, Plaintiff-Appellant,**

v.

**UNITED STATES of America and Department of Housing and Urban Development, Defendants-Appellees.**

**No. 105, Docket 72–1466.**

United States Court of Appeals, Second Circuit.

Argued Oct. 19, 1972.

Decided Dec. 15, 1972.

Alison Saxe, pro se.

David P. Land, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., Southern District of New York, Michael D. Hess, Asst. U. S. Atty., New York City, of counsel), for defendant-appellee.

Before MANSFIELD, OAKES and TIMBERS, Circuit Judges.

MANSFIELD, Circuit Judge:

This appeal raises the question of the propriety of a denial of an application for a preliminary injunction. challenging certain aspects of a code enforcement program entered into between the defendant, the U. S. Department of Housing and Urban Development ("HUD"), and the Town of Montclair, New Jersey, where a dwelling owned by plaintiff-appellant, Alison Saxe, is located. We affirm.

As part of an overall program of slum clearance and urban renewal, Congress has authorized the Department of Housing and Urban Development to join with local communities in programs of concentrated code enforcement in deteriorated areas, for which grants and loans are allocated to cities in order to facilitate enforcement of local housing violations. See 42 U.S.C. §§ 1450–1468. As a precondition to selection in this program, communities must have instituted both a "minimum standards housing code" and "an effective program of enforcement to achieve compliance with such

housing code". 42 U.S.C. § 1451(c) (Supp.1972) incorporated into 42 U.S.C. § 1468 (Supp.1972). The statutory scheme allows rehabilitation grants of up to $3,500 [1] to cover the cost of repairs and improvements necessary to conform the property to the minimal public standards for decent, safe and sanitary housing as set forth in the municipality's housing code. 42 U.S.C. § 1466(c) (Supp.1972). In addition, supplementary long-term loans at 3% interest per annum may be granted in those situations in which the $3,500 is insufficient to remedy all of the code violations. See 42 U.S.C. § 1452b. No grant and/or loan will be approved unless, as a result thereof, all outstanding housing code violations would be remedied. See U. S. Department of Housing and Urban Development, Rehabilitation Financing RAA Programs Handbook 7375.1, Ch. 4 (1968).

Pursuant to this regulatory scheme, on September 25, 1967, HUD entered into a "grant contract for code enforcement program" with the Town of Montclair in which the Government pledged up to $373,151 in return for the Town's promise to initiate and carry out a program for enforcement of housing code violations and to make additional public improvements in the code enforcement area.

Plaintiff-appellant, Alison Saxe, is an owner of a single family residence within the designated area.[2] Following her application for the $3,500 grant plus loan, inspection of her residence revealed 49 local housing code violations with an estimated cost of repair of $8,000. To remedy all the violations she was offered the $3,500 outright grant and a supplemental loan at 3% interest per annum to be secured by mortgage on the dwell-

---

1. Actually the $3,500 sum is applicable to individuals or families who earn less than $3,000 per annum with lesser sums due to those who make in excess of that sum. 42 U.S.C. § 1466(c) (Supp.1972). At oral argument it appeared that Miss Saxe earned about $7,000–$9,000 a year, thereby raising question as to her eligibility for the program. However, the government

has agreed to assume that the combined earnings of the Saxes' fall within the $3,000 figure.

2. Section 1466(a)(1) suggests that to be eligible for such a program an individual must own and occupy the property. While it is unclear whether Miss Saxe "occupies" the instant dwelling for the purposes of this appeal, we will assume that she does.

ing. This offer was refused on the ground that she would be unable to bear the cost of the additional loan as she was already in debt. As the $3,500 sum would be insufficient to conform Saxe's dwelling to the housing code, the grant was withheld.

On July 20, 1971, appellant instituted this *pro se* action in the United States District Court for the Southern District of New York. Federal jurisdiction is predicated upon 28 U.S.C. § 1331. Since appellant resided in the Southern District of New York when the action was commenced and HUD had its principal regional office there, venue was based on 28 U.S.C. § 1391. The lengthy complaint contains many disjointed charges. Describing her house as a "total loss" in which "[t]here is no plumbing . . . & flooring and steps are missing," appellant complains that HUD and the Town of Montclair have violated numerous HUD regulations and provisions of the Montclair code enforcement program, that they have failed to provide her with essential information which would have enabled her to obtain financial help over the past three years to remedy the condition of the house, and that the Town has furnished her with extravagant cost estimates to restore the house to compliance with its code.

Plaintiff alleges that she cannot afford to borrow the amount over and above the $3,500 grant which would be required to correct the violations. By way of damages she seeks a cash settlement for the current replacement value of her house, an award for "disruption of my economic life, business credit and long-range saving," and "triple damages" for HUD's failure voluntarily to reveal certain essential information. More important for present purposes is the preliminary relief sought by appellant: (1) an injunction restraining HUD from distributing certain brochures which allegedly fail to disclose adequately certain details of the instant HUD program, (2) suspension of the underlying grant contract between HUD and the Town of Montclair, (3) investigation of alleged irregularities in the program, (4) expenditure by HUD of money sufficient to rehabilitate her dwelling. Judge Pierce denied the application in all respects.

"In order to reverse the trial judge's denial of the motion for a preliminary injunction, a clear abuse of discretion must be shown." Dino de Laurentiis Cinematografica, S.p.A. v. D–150, Inc., 366 F.2d 373, 374 (2d Cir. 1966). See also Ideal Toy Corp. v. Fab-Lu Ltd., Inc., 360 F.2d 1021 (2d Cir. 1966). Of course the likelihood of ultimate success is a prime factor in such consideration. Societe Comptoir de L'Industrie Cotonniere Etablissements Boussac v. Alexander's Department Stores, Inc., 299 F.2d 33, 35 (2d Cir. 1962). Given this approach, Judge Pierce did not abuse his discretion as it does not appear that the appellant has a cognizable claim capable of resolution by the judiciary.

In the first place there does not appear to be any relationship between the distribution of the HUD brochures, which allegedly were incomplete and therefore did not adequately advise appellant of her rights under the code enforcement program, and any harm she allegedly suffered. Assuming arguendo that there was a defect in the brochures, it now appears that HUD and Montclair officials have sufficiently apprised the appellant of her rights.

Appellant's second assertion, that she has been denied the opportunity to rehabilitate her dwelling because she is unable to bear the cost of the supplementary loan needed over and above the $3,500 grant to remove all the code violations challenges, perhaps unconsciously, the legality of federal grant-in-aid programs of the type here invoked. The ultimate goal of such cooperative federal-state programs is to provide federal assistance required to enable states, municipalities, educational institutions and other bodies to undertake projects of obvious public benefit and importance in a variety of fields, including housing,

urban renewal and slum clearance (which is the case here), construction of sewage treatment plants, 33 U.S.C. § 1158, development of regional medical programs, 42 U.S.C. § 299c, prevention of school dropouts, 20 U.S.C. § 887, and the like. Lacking the essential funds to finance these local programs on their own, municipalities have turned to the federal government for help in the form of cooperative grants or direct revenue sharing.

In assuming part of the financial burden required to make possible such programs, the federal government has sought to maximize the effectiveness of its contribution and to protect against diversion of its outlay by imposing reasonable conditions. In the present case, for instance, the $3,500 outright grant is conditioned on raising sufficient additional funds, either by a low-cost federal loan or by the owner's own resources, to remedy the violations. Congress' purpose in authorizing such rehabilitation loans was

> "to provide a source of financing to those persons and businesses in an urban renewal area who are presently unable to undertake necessary rehabilitation of their property because they cannot obtain loans in sufficient amounts or at such terms as they can afford to carry." [3] H.R. No. 1703, 88th Cong., 2d Sess., 1964 U.S.Code Cong. & Ad.News, p. 3431.

It has been Congress' hope that the ultimate result of the grant-loan program will be to benefit all concerned by eliminating the decay and dilapidation that has operated to depress the lives and morale of the inhabitants of such blighted areas.

Even if it be assumed argeundo that participation by the Town of Montclair in the program will result in more vigorous enforcement of its existing regulations which represent a valid exercise of its police power, this would not provide a basis for legal objection to the program. Montclair's decision to enforce its housing code is undeniably its right. If it had decided to enforce that code without participation in the federal aid program, there admittedly could be no complaint, even though Miss Saxe, like many others, would in such event probably be charged with violation of the

---

3. The House Report continued as follows:

"Loans under this program could finance the improvement or repair of structures, or facilities in connection with the structures. A loan could, for example, finance the provision of sanitary or other facilities that are required by the applicable codes or the urban renewal plan. The term of the loan could not exceed the lesser of 15 years or three-fourths of the remaining economic life of the structure after rehabilitation.

\* \* \* \* \* \* \* \*

"The committee has long felt the need for an effective program which would enable the owners of property in urban renewal areas to finance needed repairs and rehabilitation. The committee had high hopes that the FHA section 220(h) program for rehabilitation of property in urban renewal areas authorized by the Housing Act of 1961 would enable the owners of property in urban renewal areas to finance needed repairs and rehabilitation. That program, however, has been unsuccessful in helping many who need assistance, but do not have the commercial credit rating or the financial resources needed to carry loans with the interest charges involved. The committee believes that a direct loan low-interest rate program of the type provided by this bill is a feasible method of stimulating private owners to undertake needed rehabilitation of their property in urban renewal areas.

"The committee believes that the cost of these loans will be recaptured many times over by the reduction in the need for demolition of structures in urban renewal areas which will result from this program. The committee believes that this low-interest rehabilitation loan program, coupled with those provisions of this bill which strengthen and emphasize the role of code enforcement by the communities, and authorize urban renewal projects which consist entirely or substantially of a program of intensive code enforcement, can substantially assist in eliminating and preventing the development and spread of slums and blight without the use of urban renewal capital grant funds." H.R.Rep. No. 1703, 88th Cong., 2d Sess., 1964 U.S. Code Cong. & Ad. News, pp. 3431, 3432.

code and face possible condemnation of her house. The Town's choice of the present method has the salutary effect of providing a greater opportunity to its citizens as a whole to avoid such unfortunate consequences through low cost loans for repairs and rehabilitation. A program of such obvious benefit to the community should not be jettisoned because a few cannot or will not take advantage of it.

■ Miss Saxe's appeal must fail for still another reason. There is no evidence that Montclair has increased its enforcement efforts with respect to her or that it plans to do so. Even if it had done so, preliminary injunctive relief would be inappropriate since the Town, which controls the enforcement steps to be taken, has not been joined as a party.

■ In our view the suggestion that the instant federal aid program is vulnerable under the Equal Protection Clause on the ground that it discriminates against the poor cannot succeed, at least in the present case. Nothing on the face of the laws involved—the federal statute and Montclair's housing code—reveals any such discriminatory purpose. The classification of those eligible for the combination of a HUD grant and loan is not based upon wealth but upon the sums needed to rectify code violations.[4] Even assuming that such housing represented a fundamental interest, the Supreme Court has recognized, in view of the finite resources available, that reasonable latitude should be allowed in the dispensation of public funds to those in need, even though the level of benefits will inevitably work hardships in some cases. Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). "If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality'". Id. p. 485, 90 S.Ct. p. 1161, quoting from Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369 (1911). Indeed, the Supreme Court has recently refused to strike down a housing classification having a justification far less comprehensible than that here, pointing out "But of course a lawmaking procedure that 'disadvantages' a particular group does not always deny equal protection," James v. Valtierra, 402 U.S. 137, 142, 91 S.Ct. 1331, 1334, 28 L.Ed.2d 678 (1971). But see English v. Town of Huntington, 448 F.2d 319, 324, 327 (2d Cir. 1971) (dissent), and Note, The Equal Protection Clause and Exclusionary Zoning After Valtierra and Dandridge, 81 Yale L.J. 61, 76–81 (1971).

Thus, the most that can be advanced is that the HUD program may encourage Montclair to enforce building codes, the impact of which falls especially heavily on the poor. However, this contention was not specifically advanced by Miss Saxe and its factual basis is not evident from the record. We are left in complete uncertainty as to whether Montclair will enforce its code against Miss Saxe; if so, what method of enforcement it will use; and what the effect of enforcement will be upon her occupancy of the premises. Upon such an imprecise and murky record, we cannot conclude that the pertinent provisions of the Urban Renewal statute or HUD's rehabilitation program deny her equal protection.

Much as we sympathize with the plight of Miss Saxe, we fail to see that she states a claim upon which judicial relief can be granted. The denial of preliminary injunctive relief did not therefore constitute an abuse of discretion.

The order is hereby affirmed.

4. Theoretically, someone with no independent income, who is in possession of a $50,000 house, with $25,000 in housing violations, would be unable to secure a grant, if he were unable to maintain payments on the loan. An individual with a $50,000 asset could hardly be deemed "poor," at least in equal protection terms. In this vein, it is doubtful whether Miss Saxe and her mother, who own both the house in Montclair and a cooperative apartment in Manhattan, may be classified as "poor." See also fn. 1 supra.