517 F.2d 409
 METROPOLITAN HOUSING DEVELOPMENT CORPORATION, an Illinois
not-for-profit Corporation, et al., Plaintiffs-Appellants,
v.
The VILLAGE OF ARLINGTON HEIGHTS, a Municipal Corporation,
et al.,Defendants-Appellees,
Northwest Opportunity Center, Inc., and Eluteria D.
Maldonado, InterveningPlaintiffs-Appellants.
 No. 74-1326.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 13, 1975.
Decided June 10, 1975.
 
 William J. McNally, Carol M. Petersen, F. Willis Caruso, Robert G. Schwemm, Gerald J. Muller, Chicago, Ill., for plaintiffs-appellants.
 Jack M. Siegel, Chicago, Ill., for defendants-appellees.
 Before FAIRCHILD, Chief Judge, and SWYGERT and SPRECHER, Circuit Judges.
 SWYGERT, Circuit Judge.
 
 
 1
 The question in this case is whether the Village of Arlington Heights' refusal to rezone a piece of property in order to permit the construction of a housing development for low and moderate income persons violates plaintiffs' constitutional rights.
 
 
 2
 Plaintiff Metropolitan Housing Development Corporation is an Illinois nonprofit corporation organized in 1968 for the purpose of developing low and moderate income housing in the Chicago metropolitan area. It was selected by the Clerics of St. Viator, a Catholic religious order, to develop the land in question for low and moderate income housing. The Clerics have title to eighty acres of land in Arlington Heights, a suburb northwest of Chicago, on part of which is situated their novitiate and high school. The land they wish to make available is a vacant fifteen acres in the southeast corner of the acreage. This property is bounded on the east by single family homes on the south by Euclid Avenue which has single family homes, on the side opposite St. Viator's property, and on the west and north by undeveloped St. Viator property. The Clerics entered into a ninety-nine year lease and sale agreement with Metropolitan Housing which provided that the land was to be developed for subsidized housing. The price was to be $300,000.
 
 
 3
 Metropolitan Housing proposed to use the land for a 190 unit townhouse development to be called "Lincoln Green." Under the plan more than sixty percent of the property was to be maintained as open space. The financing was to be provided pursuant to section 236 of the National Housing and Urban Development Act of 1968, 12 U.S.C. § 1715z-1. These units would have been the only subsidized housing in Arlington Heights despite a great demand for such housing in that area.
 
 
 4
 The fifteen acres on which Lincoln Green was to be situated, like the remainder of the St. Viator property, has always been zoned R-3, single family; in fact, all of the land surrounding the property is zoned R-3. In order to build this development, however, the fifteen acres would have to be rezoned to R-5, multifamily. Since 1959 the Village has had its "Comprehensive Plan" that provides that an area should be zoned R-5 only if it represents a "buffer" zone or transition between single family zoning and commercial, industrial, or other high intensity uses.
 
 
 5
 Metropolitan Housing applied for a zoning change. As the district court found after trial, Metropolitan Housing "took the necessary administrative steps to obtain rezoning and made various changes in its proposal in an attempt to satisfy various objections which were raised by the Village's Plan Commission." Metropolitan Housing presented studies showing that Lincoln Green would not cause major traffic problems and would make a net contribution to the Village in terms of taxes. Still, after holding public hearings, the Plan Commission recommended against the rezoning and on September 28, 1971 the Board of Trustees of the Village voted six to one to deny the request. The apparent reason for the rejection was that the property was in the middle of a completely single family area and would not act as a buffer zone as required by the Comprehensive Plan.
 
 
 6
 This suit was then instituted by Metropolitan Housing and the individual plaintiffs who seek to represent moderate income minority members who work or desire to work in Arlington Heights but cannot find decent housing there that they can afford. (Northwest Opportunity Center, another not-for-profit corporation, and Eluteria Maldonado have been allowed to intervene as plaintiffs.) The complaint alleges that the refusal to rezone perpetuated segregation and denied Metropolitan Housing the right to use its property in a reasonable manner in violation of the Fourteenth Amendment, the Civil Rights Act of 1866 (42 U.S.C.A. §§ 1981 and 1982), the Civil Rights Act of 1871 (42 U.S.C. § 1983), and the Fair Housing Act of 1968 (42 U.S.C. § 3601 et seq.). The relief requested is a declaratory judgment invalidating the Arlington Heights zoning ordinance as applied to the subject property and an injunction restraining defendants, among whom are the individual Trustees of the Village, from preventing or interfering with the development of the housing proposed by Metropolitan Housing.
 
 
 7
 After a trial on the merits the district court denied the plaintiffs any relief. It found that there were good faith reasons for the refusal to rezone and that the decision did not have a racially discriminatory effect. It held that plaintiffs were attempting to extend the Fourteenth Amendment beyond its outer limits. We disagree and reverse.
 
 
 8
 * The first contention raised by plaintiffs is that they have been denied equal protection of the law in that the Village's zoning policy has been administered in a discriminatory manner. See Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). They claim that had Lincoln Green been a commercial development the zoning change would have been granted. We agree that this contention, if proved, would state a claim entitling plaintiffs to the relief sought. The district court, however, found that this claim was not proved, and we cannot say that the finding was clearly erroneous.
 
 
 9
 The evidence on this point relates to the results of other requests for zoning changes to R-5. Plaintiffs contend that sixty zoning changes to R-5 were granted to commercial developers and these changes show that the policy of using R-5 property only as a buffer zone had not been followed. Thus it is argued that the buffer zone explanation is really a "sham" excuse offered only because the Village did not wish to have a housing project for low and moderate income families.
 
 
 10
 The evidence, however, relating to both grants and denials of requested zoning changes does not require the conclusion that had Lincoln Green been a proposed commercial development the variance would have been granted despite the fact that the development would not serve as a buffer zone. Plaintiffs' own expert agreed that the Village had conformed to its Comprehensive Plan for approximately two-thirds of these sixty zoning changes. His report listed fifteen relevant instances of failure to adhere to the stated policy. Defendants' witness disputed this conclusion in regard to many of these and offered explanations for the others. Our review indicates that in only four relevant instances were there clear violations of the buffer zone policy and in another two instances a questionable violation. This must be balanced against the defendants' evidence concerning the zoning change refusals. That evidence shows that prior to the Lincoln Green rejection there were two proposed changes rejected at least in part on the basis of the buffer zone policy and another four rejections which might have been on this basis though this was not stated. There were also two proposals that were withdrawn after the Plan Commission had recommended their rejection at least partly on the basis of the apartment policy. A third withdrawal after a rejection recommendation might have been for the same reason. Subsequent to the ruling on Metropolitan Housing's proposal, the Plan Commission recommended the rejection of two other requests on the ground of the buffer zone policy (one of these was then withdrawn and the other had not been passed upon by the Village Board at the time of trial).
 
 
 11
 The inference that can be drawn from this evidence is that Arlington Heights has been applying its buffer zone policy in considering requests for zoning changes though not with absolute consistency. The evidence does not necessitate a finding that Arlington Heights administered this policy in a discriminatory manner. While more detailed factual findings concerning these zoning changes would have been helpful, an examination of the record and exhibits indicates that the district court's finding that defendants were concerned with "the integrity of the Village's zoning plan" is not clearly erroneous.
 
 II
 
 12
 Plaintiffs also argue that even if the buffer zone policy has been properly applied the refusal to rezone the land has a racially discriminatory effect and perpetuates Arlington Heights' segregated character. Regardless of the Village Board's motivation, if this alleged discriminatory effect exists, the decision violates the Equal Protection Clause unless the Village can justify it by showing a compelling interest. See Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1963).
 
 
 13
 The real question is whether there is a racially discriminatory effect for equal protection purposes. It is true that a greater percentage of blacks than whites are affected by the Village's decision since a greater percentage of blacks than of whites are in the low and middle income categories that are eligible for this proposed section 236 housing development. (Blacks comprise forty percent of the eligible prospective tenants.) But this disparity does not necessarily mean that the zoning change refusal had the type of racially discriminatory effect that requires the invocation of the compelling state interest tests. As indicated, the "class" that is affected by the Village's action is composed of individuals with low and moderate incomes. Racial minorities constitute a higher percentage of this class than they do percentagewise of the population in general within the Chicago metropolitan area. This fact alone, however, does not make decisions that affect those in the lower income bracket more than others racially discriminatory governmental actions. English v. Town of Huntington, 448 F.2d 319, 324 (2d Cir. 1971). Governmental action having a disproportionate impact on a class composed of an extremely high percentage of racial minorities might be classified as discriminatory in an equal protection sense. But that is not this case. Indeed, this narrow question has, we think, impliedly been answered by the Supreme Court in James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971). James was concerned with a provision of the California Constitution that required state developed low-rent housing projects to be approved only upon a referendum vote. The briefs presented to the Court showed that at least some of the defeated housing proposals were in areas with a disproportionately high minority population and that racial minorities would have benefited more from the low income housing. Yet, the Supreme Court explicitly rejected the contention that the provision created a racial distinction that is subject to strictest scrutiny:
 
 
 14
 The Article requires referendum approval for any low-rent public housing project, not only for projects which will be occupied by a racial minority. And the record here would not support any claim that a law seemingly neutral on its face is in fact aimed at a racial minority. 402 U.S. at 141, 91 S.Ct. at 1333.
 
 
 15
 Accordingly, James supports our analysis that racial disparity alone as it relates to the housing project under consideration does not amount to racial discrimination.
 
 III
 
 16
 It is argued on behalf of plaintiffs that in the type of situation before us an analysis of racial discrimination must, however, extend further. See United States v. City of Black Jack, Missouri, 508 F.2d 1179 (8th Cir. 1974). The impact of the Village's refusal to rezone "must be assessed not only in its immediate objective but its historical context and ultimate effect." Kennedy Park Homes Association v. City of Lackawanna, New York,436 F.2d 108, 112 (2d Cir. 1970).
 
 
 17
 The instant case reflects the unfortunate fact that historically the Chicago metropolitan area has been segregated in terms of housing. As we recently said in Clark v. Universal Builders, Inc., 501 F.2d 324, 334-35 (7th Cir. 1974), "Nor do we think it beyond the strictures of judicial notice to observe that there exists in Chicago and its environs a high degree of racial residential segregation." More specifically, the population of Arlington Heights in 1970 was 64,884, but only twenty-seven residents were black.[1] The four-township northwest Cook County area, of which Arlington Heights is a part, had a population increase from 1960 to 1970 of 219,000 people, but only 170 of these were black.[2] Indeed, the percentage of blacks in this area actually decreased over this ten-year span while the percentage of the population in the entire Chicago metropolitan area that was black increased from fourteen percent to eighteen percent.
 
 
 18
 The ultimate effect of the Village's decision is, in all probability, that no section 236 housing will be built in Arlington Heights since plaintiffs were unable to find an economically feasible and suitable alternative site. Consequently a development for which blacks represent forty percent of the eligible applicants will not be built. Parenthetically, it must be noted that based solely on the cost of presently available housing of all types in the Chicago area, blacks would occupy five percent of the housing in Arlington Heights. We have no doubt that if Lincoln Green were built, it, unlike the rest of the Village, would be an integrated community. Though the building of this project might have only minimal effects in terms of alleviating the segregative housing problem for the entire Chicago area, it might well result in increasing Arlington Heights' minority population by over one thousand percent. What is even more crucial is that this suburb has not sponsored nor participated in any low income housing developments, nor does the record reflect any such plans for the future. Realistically, Lincoln Green appears to be the only contemplated proposal for Arlington Heights that would be a step in the direction of easing the problem of de facto segregated housing. Thus the rejection of Lincoln Green has the effect of perpetuating both this residential segregation and Arlington Heights' failure to accept any responsibility for helping to solve this problem.
 
 
 19
 The defendants' answer is that even if the refusal to rezone does have this effect it cannot be deemed a "discriminatory" effect. Since no direct action attributable to Arlington Heights created the segregated housing pattern, the municipality argues that it has no affirmative duty to alleviate the problem. We do not agree.
 
 
 20
 Merely because Arlington Heights did not directly create the problem does not necessarily mean that it can ignore it. In Clark v. Universal Builders, Inc., 501 F.2d 324 (7th Cir. 1974), we, in effect, required that a builder forego "market prices" for homes built in black areas because the inflated "market prices" were a result of the segregated housing situation that could not simply be ignored. The builder could not "exploit" the situation even though he was in no way responsible for the discrimination that created the problem. To do so was itself an act of discrimination prohibited by 42 U.S.C. § 1982.
 
 
 21
 In the instant case Arlington Heights has been ignoring what is essentially the same basic problem. Indeed, it has been exploiting the problem by allowing itself to become an almost one hundred percent white community. The Lincoln Green proposal represents an opportunity to help reverse this trend both in the entire Chicago area and more dramatically in the composition of the Village itself. Yet defendants argue that the Village need not consider such factors and that we should ignore them in determining whether there is a discriminatory effect in this case. But we cannot ignore segregation. This much is evident from Clark in terms of section 1982 and the Thirteenth Amendment and we think the principle is applicable to the Fourteenth Amendment in this case. Cf. United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach, Florida, 493 F.2d 799, 810-11 (5th Cir. 1974). Because the Village has so totally ignored its responsibilities in the past we are faced with evaluating the effects of governmental action that has rejected the only present hope of Arlington Heights making even a small contribution toward eliminating the pervasive problem of segregated housing. We therefore hold that under the facts of this case Arlington Heights' rejection of the Lincoln Green proposal has racially discriminatory effects. It could be upheld only if it were shown that a compelling public interest necessitated the decision.
 
 IV
 
 22
 The argued justifications for the decision are based on two grounds: maintaining integrity of the zoning plan (buffer policy) and protecting neighboring property values. Neither of these can be deemed "compelling."
 
 
 23
 As we have already indicated, the Village has not even been consistent in applying its zoning plan when considering requests for zoning changes to R-5. Moreover, even if a municipality's desire to limit multifamily dwellings to instances in which they might serve as a transitional buffer zone could ever be a compelling interest, it is certainly not in this case. Lincoln Green will not be a high-rise development, but merely a cluster of two-story townhouses no higher than the surrounding single family homes. As noted by two dissenting members of the Arlington Heights Plan Commission, in terms of density, architecture and most other characteristics, such townhouses are more similar to R-3 dwellings than R-5 buildings. The planning rationale behind the buffer zone policy has only minimal applicability to this type of low-rise, open-space development. It is not a sufficiently compelling interest to justify the racially discriminatory effect.
 
 
 24
 Nor do we find that the decision can be supported by the fact that neighboring property values might be diminished by as much as five to ten percent as asserted by defendants' witness. It is questionable whether this purely private monetary consideration could be a compelling interest. In this instance it is not. The explanation for this diminution in value is that the single family property owners had relied on the integrity of the Comprehensive Plan and Lincoln Green would be a variance from the expected totally single family neighborhood. Not only have there been other variances in Arlington Heights, but the neighboring residents certainly could not expect that the zoning plan would always be adhered to even when a racially discriminatory effect would be the result.
 
 
 25
 Since no compelling justification for the decision exists, the refusal to grant the requested zoning change is a violation of the Equal Protection Clause of the Fourteenth Amendment. Accordingly, the judgment of the district court is reversed and this cause is remanded for entry of judgment in accordance with this opinion.
 
 
 26
 FAIRCHILD, Chief Judge (dissenting).
 
 
 27
 I agree that the district court's finding that defendants' refusal to grant plaintiffs a zoning variance was motivated by valid planning considerations is not clearly erroneous. I also agree that, if plaintiffs establish that the Village's enforcement of its zoning scheme makes construction of housing for low and moderate income individuals not reasonably possible, the refusal perpetuates racial segregation and, absent compelling governmental justification, the plaintiffs would be entitled to the relief they seek. United States v. City of Black Jack, Missouri, 508 F.2d 1179, 1186 (8th Cir. 1974).
 
 
 28
 The majority states that "(t)he ultimate effect of the Village's decision is, in all probability, that no section 236 housing will be built in Arlington Heights since plaintiffs were unable to find an economically feasible and suitable alternative site." I cannot agree that the record supports such a conclusion. The district court found that the Village "(has) zoned 60 tracts for the R-5 use and some of it is still vacant and available to plaintiff." I cannot say that this finding was clearly erroneous. A review of the record reveals that, at the time of the Village's decision to deny the variance, there were at least nine undeveloped tracts of land in excess of fifteen acres zoned R-5 (multi-family housing). The record does not contain a sufficient showing by plaintiffs that it was not reasonably possible to construct the proposed project on one of these sites.
 
 
 29
 Accordingly, I would affirm the district court's judgment in favor of defendants.
 
 
 
 [1]
 According to statistics of plaintiffs' expert, demographer and urbanologist Pierre de Vise, Arlington Heights is the most residentially segregated community in the Chicago metropolitan area among municipalities with more than fifty thousand residents
 
 
 [2]
 The impact of this statistic can be fully appreciated only in the context of the shift in employment opportunities during that same period. While the City of Chicago lost 230,000 jobs, the number of jobs in the four-township Arlington Heights area rose from 100,000 to 200,000. Blacks, however, have not been able to take full advantage of these job opportunities. In 1970 only 137 of the 13,000 people who worked in Arlington Heights were black. Part of the explanation for this is that many black workers have been unable to find housing they can afford in Arlington Heights. A study issued by the Cook County Office of Economic Opportunity indicated that based on its survey almost all the black workers in Arlington Heights resided in Chicago. Moreover, the report stated that one of the main problems Arlington Heights' employers faced in hiring minorities was the lack of adequate housing within a reasonable distance of their plants